104 Cal.Rptr.2d 85 (2001)
86 Cal.App.4th 683
The PEOPLE, Plaintiff and Respondent,
v.
Brandon Wade HEIN, et al., Defendants and Appellants.
No. B106689.
Court of Appeal, Second District, Division Seven.
January 29, 2001.
Review Denied April 25, 2001.[**]
Certiorari Denied October 1, 2001.
*87 Robert Derham, under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant Micah Holland.
John Steinberg, under appointment by the Court of Appeal, Laguna Beach, for Defendant and Appellant Anthony Miliotti.
Aron Laub, Woodland Hills, for Defendant and Appellant Jason Skip Holland.
Marilee Marshall & Associates and Marille Marshall, Pasadena, for Defendant and Appellant Brandon Wade Hein.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, March Sanchez, Supervising Deputy Attorney General, and Victoria Bedrossian, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]
Certiorari Denied October 1, 2001. See 122 S.Ct. 204.
*86 STOEVER, J.[***]
This is an appeal from convictions (by jury) of various offenses, as follows:
1. Appellants Brandon Wade Hein, Micah Holland, Jason Holland and Anthony Miliotti: Count I, burglary (Pen. Code, § 459). Count II, attempted robbery (Pen.Code, §§ 664/211, 1192.7, subd. (c)(19)). Count IV, murder committed during the course of a burglary and an attempted robbery (Pen.Code, §§ 187, subd. (a), 190.2, subd. (a)(17), 1192.7, subd. (c)(1)). The jury found to be true allegations of special circumstances and found the murder, burglary and attempted robbery to be of the first degree.
*88 2. Appellant Jason Holland (only): In addition, the jury found this appellant, guilty of the lesser crime of assault with a deadly weapon as to count V, attempted willful, deliberate, premeditated murder. (Pen.Code, §§ 664/187, subd. (a), 1192.7 subd. (c).) The jury also found to be true the personal use allegations as to counts I, II and IV (Pen.Code, §§ 12022, subd. (b)) and the great bodily injury allegations as to counts I, II and V (Pen.Code, §§ 12022.7, subd. (a), 1192.7 subd. (c)(8)). (The jury found the allegations of personal use and great bodily injury to be not true as to the remaining appellants.)
Appellants were sentenced to state prison, as follows:
1. Jason HollandLife without possibility of parole plus eight years.
2. Brandon HeinLife without possibility of parole plus four years.
3. Anthony MiliottiLife without possibility of parole plus four years.
4. Micah Holland29 years to life.

SUMMARY OF FACTS AND PROCEEDINGS
Michael McLoren (McLoren) maintained a structure referred to as "the fort" in the backyard of his residence. The fort was a 13' × 14' enclosed structure furnished with, among other accoutrements, a bed and desk. The desk had two drawers containing marijuana and money. The top drawer contained marijuana for personal use. The second drawer, which was customarily locked, contained money and marijuana for sale. McLoren kept the key to the lock. The fort was generally known as a place where young persons could obtain and smoke marijuana. The existence of the marijuana and cash and their location were not secrets.
All facts relevant to the charged offenses occurred on May 22, 1995.
Jimmy Farris (Farris) and McLoren were friends. Although acquainted with appellants, Farris and McLoren were not friends with appellants. During the afternoon and evening, appellants were constantly in the company of each other, visiting friends, "cruising" the neighborhood and engaging in the conduct more specifically discussed below. Appellants were traveling about in a red pickup truck owned and driven by Christopher Velardo (Velardo).
In less than an hour before the charged offenses, at a location close to McLoren's residence, appellant Jason Holland (Jason) stole the wallet of Alyce Moulder (Moulder) from the Moulder vehicle. All of the other appellants were present in the pickup truck driven by Velardo. A short time later, Moulder spotted the Velardo truck and confronted Velardo and appellants. Velardo, the Holland brothers, and Brandon Hein (Hein) verbally accosted and threatened Moulder, struck the Moulder vehicle with objects and spat on the Moulder vehicle. (Hereinafter referred to as the "Moulder incident".) Although present throughout the Moulder incident, there is no evidence that appellant Anthony Miliotti (Miliotti) participated in it.
At approximately 7:00 p.m. McLoren and Farris were in the McLoren backyard in the immediate vicinity of the fort. Without permission or invitation, all appellants as a group entered the McLoren backyard by hopping over a fence. Micah Holland (Micah) and Miliotti entered first. Jason and Hein followed approximately ten to fifteen feet behind Micah and Miliotti. Micah immediately entered the fort and Miliotti stood in the doorway. Appellants did not have permission or invitation to enter the fort. There had not been prior arrangement for the sale of marijuana between McLoren and appellants.
Appellant Jason was carrying a folding pocketknife. There is no evidence that appellants Micah, Hein, or Miliotti carried weapons or that any of them knew Jason carried a pocketknife.
Appellant Micah unsuccessfully attempted to pull open the locked desk drawer. Next, appellants Micah and Hein, in a *89 threatening manner, shouted words demanding that McLoren turn over the key to the locked desk drawer. Appellant Micah, when threatening McLoren and demanding the key, shouted, "Give me the key fool" and "Give me the key, ese. You want shit with Gumbys, ese?" McLoren refused to relinquish the key.
Appellants Micah, Jason and Hein then verbally and physically assaulted McLoren. The intensity and violence of the battle escalated. McLoren held Micah face down on a bed and elbowed him about the back and neck. Jason attempted to pull McLoren off of Micah. McLoren kicked Jason in the face. McLoren then heard appellant Jason say, "Let's get this fucker." While being held in a headlock, McLoren twice felt sharp, debilitating, pulsating sensations, which later proved to be multiple stab wounds. Jason admitted stabbing McLoren.
After McLoren was stabbed, Farris entered the fort and became involved in the melee. Farris confronted Jason, who turned and, without hesitation, stabbed Farris twice in the torso. Immediately thereafter, McLoren observed Hein beating Farris in the head and face with his fists. Farris did not resist or otherwise defend himself from the blows administered by Hein.
Both McLoren and Farris broke away from the fight and ran to McLoren's house. They each reported to McLoren's mother that "... they [appellants] came to get our stuff ..." and had stabbed them. Mrs. McLoren saw a stab wound in the center of Farris' chest.
Witnesses observed appellants together leaving the McLoren yard, being met by the Velardo pickup truck and driving away in Velardo's pickup truck. A witness testified that he observed the four appellants on the street as they left the McLoren backyard apparently talking among themselves and smiling.
The evidence of Miliotti's involvement at or inside the fort consists of the testimony of McLoren, Jason and exhibits entered in connection therewith.
Jason testified that from the outset of the confrontation and fight Miliotti, who was physically the largest of the three appellants, stood in the doorway of the fort and that he (Jason) did not see Miliotti inside the fort. Jason testified that the only three people involved in the fight were McLoren, Micah and himself. Jason also testified that he was the one who pulled McLoren from Micah and that he (Jason) was the one who held McLoren during the stabbing. In depth cross-examination by the district attorney did not place Miliotti inside the fort.
McLoren's testimony regarding Miliotti's involvement is equivocal and contradictory. McLoren testified that all four appellants entered his backyard and positioned themselves around him in a manner making him feel surrounded. McLoren testified that Miliotti only stood in the doorway of the fort during the fight (a few feet away) and that he (McLoren) did not know if Miliotti ever entered the fort; that Miliotti did enter the fort and participated in the fight; that he (McLoren) thought Miliotti held him in a headlock when Jason stabbed him, but did not actually see Miliotti; that he (McLoren) did not know who imposed the headlock.
During initial police interviews, McLoren stated that Velardo was one of the four persons involved. Miliotti was not mentioned. Several days later, McLoren changed his statement and identified Miliotti as a participant, excluding Velardo.
The testimony of appellant Jason contradicted many of the details of the Moulder incident, as recited above. Jason testified that he, while travelling to McLoren's house and upon entering the McLoren property, at all times "believed" appellants went to the McLoren fort for the purpose of purchasing marijuana. Jason testified that, although he knew McLoren sold marijuana from the fort, he (Jason) had never himself purchased marijuana from McLoren. *90 Jason testified that a fight quickly ensued between Micah and the much larger McLoren.
Jason testified that he feared for his brother's (Micah) safety and that in coming to the aid of Micah, he (Jason) was kicked in the face. Jason admitted in open court that in the course of the fight he did in fact stab both McLoren and Farris. Jason told the other appellants and Velardo that he (Jason) had stabbed both McLoren and Farris and showed them his knife with blood on it. Up to this point, the evidence is that only appellant Jason knew that McLoren and Farris had been stabbed.
Jason testified that he was under the influence of alcohol during both the Moulder incident and the events at the fort.
McLoren was hospitalized for stab wounds, which were constantly and intensely painful. Jimmy Farris died. The cause of Farris' death was the stab wound(s) inflicted during the fight with appellants.
In a telephone conversation, Jason's mother told him that he was wanted for murder. Jason fled and went into hiding for several weeks. Subsequently, he voluntarily surrendered to law enforcement authorities.
[][]

XIV. Sufficiency Of The Evidence To Sustain Felony Murder Convictions

Appellants contend that the evidence is insufficient as a matter of law to sustain felony murder convictions. We do not agree.
"`To determine whether there is substantial evidence to support a conviction ... [the reviewing court] ... must view the record in a light most favorable to conviction, resolving all conflicts in the evidence and drawing all reasonable inferences in support of conviction. [The reviewing court] ... may conclude that there is no substantial evidence in support of conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant guilty on the theory presented. [Citation.]'" (People v. Campbell (1994) 25 Cal.App.4th 402, 408, 30 Cal.Rptr.2d 525.)
Substantial evidence supports the felony murder convictions of all appellants. As a group, appellants were present during and/or involved in the Moulder incident. As a group, appellants rode in Velardo's truck to the McLoren property. As a group, appellants entered the McLoren property by hopping the fence and proceeding directly to the fort. As a group, appellants stood in close proximity to Micah as he attempted to pull open the desk drawer. As a group, appellants stood in close proximity to the initial Micah McLoren verbal confrontation. Within seconds thereafter, Hein entered into the verbal confrontation with McLoren and the physical altercation began. Appellants Micah, Jason and Hein were active participants in the fight. Jason admitted stabbing both McLoren and Farris during the fight. As a group, all appellants left the McLoren property, talking with each other and smiling. As a group, appellants boarded Velardo's truck and left the scene.
Miliotti did not withdraw from the action, leave the premises before commission of the crime(s) or do anything to prevent the commission of those crimes.
Clearly, the jury found the fight and stabbings to be parts of one continuous course of criminal conduct. Such a finding is the only reasonable conclusion under the facts before this court.
The felony murder conviction of appellant Miliotti could only have been based upon the finding that he was an aider and abettor to the underlying felonies of burglary and attempted robbery. The issues are whether or not he shared *91 the intent requisite to the underlying felonies, whether or not he had the requisite knowledge of the perpetrators' unlawful purpose and whether or not he intended to aid and abet in the commission of that unlawful purpose. These issues are fundamentally questions of fact for jury determination, i.e., was Miliotti merely a casual observer or an aider and abettor?
Counsel for Miliotti argued at length that Miliotti was simply in the wrong place at the wrong time. In other words, that, although he was present, there was no evidence involving Miliotti in the Moulder incident; that, although present at the fort, Miliotti merely stood at the doorway; and, that there was no evidence that Miliotti participated in the attempt to take marijuana or was physically involved in the fight. Defense counsel argued the exclusionary language of CALJIC No. 3.01, infra.
The trial court instructed the jury as to the equal guilt of principals in a crime, including those who directly or actively commit the crime and those who aid and abet therein. (CALJIC No. 3.0) The trial court also instructed the jury as to the definition of aiding and abetting, including that which aiding and abetting is not (CALJIC No. 3.01): "Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting;" and, "[m]ere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."
The court also instructed the jury, "[i]f a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery and/or burglary, all persons who either directly or actively commit the act constituting the crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (CALJIC No. 8.27; approved in People v. Pulido (1997) 15 Cal.4th 713, 728, 63 Cal.Rptr.2d 625, 936 P.2d 1235.)
The evidence regarding Miliotti's role in the events at the fort was conflicting. The jury resolved this conflict, applied the law as instructed by the court and convicted Miliotti. It would be reasonable to infer from the evidence of Miliotti's conduct that he assumed his position in the doorway, in close proximity to McLoren, to intimidate McLoren, to block McLoren's exit and/or to act as a lookout.
While it is generally correct that neither mere presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission, "[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (In re Lynette G. (1976) 54 Cal.App.3d 1087, 1094, 126 Cal.Rptr. 898; People v. Campbell, supra, 25 Cal. App.4th at p. 409, 30 Cal.Rptr.2d 525.)
There is substantial direct and circumstantial evidence to support the convictions of all appellants.

XV. Sufficiency Of The Evidence For Special Circumstance Finding

Appellants contend that the evidence is insufficient to support the special circumstance finding. (Pen.Code, § 190.2, subd. (d).)
The stringent standard of review for an insufficiency of the evidence contention is found in People v. Campbell, supra, 25 Cal.App.4th at page 408, 30 Cal.Rptr.2d 525.
The jury was instructed that it could only find the special circumstance to be true if they found beyond a reasonable doubt (1) that the defendant with the intent to kill aided and abetted any actor in *92 the commission of the first degree murder; or, (2) that the defendant with reckless indifference to human life and as a major participant aided "or" abetted in the commission of the attempted robbery and burglary which resulted in the death of Farris. (CALJIC No. 8.80.1; Pen.Code, § 190.2, subd. (d); Tison v. Arizona (1987) 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127.)
Although a death penalty case, the opinion in Tison is helpful in weighing the sufficiency of the evidence for application of the special circumstance provisions of Penal Code section 190.2(d). In Tison the majority opinion discusses the significant overlapping of the "major participant" and mental state requirements. In other words, the greater the defendant's participation, the more likely he acted with reckless indifference to human life.
Appellant Jason entered the McLoren property in possession of a pocketknife. He admits intentionally stabbing both McLoren and Farris with that knife. Jason killed Farris while engaged in the commission of an attempted robbery and burglary. There is abundant evidence supporting the special circumstance finding as to Jason.
Both appellants Hein and Micah were active participants in the attempted robbery and burglary that culminated in the death of Farris. Both Hein and Micah continued their violent, assaultive behavior before, during and after Jason shouted "Let's get this fucker," referring to McLoren. The stabbing of Farris occurred immediately, without hesitation, following the stabbing of McLoren. There is ample evidence to support the jury findings that Hein and Micah were "major participants" and that they acted "with reckless indifference to human life."
The evidence as to appellant Miliotti presents a more difficult inquiry. Respondent argues that it may be inferred that Miliotti entered the fort and actively participated in the fight. However, the evidence is persuasive that Miliotti did not enter the fort, but merely stood in the doorway during the activities inside the fort. The only evidence placing Miliotti inside the fort is the equivocal testimony of McLoren, who stated he thought Miliotti was in the fort, but didn't actually see him there. (On one occasion, the court struck such testimony as speculative. On another, no objection was raised or motion to strike made.) McLoren did testify that he actually saw Miliotti standing in the doorway. Jason, who was intoxicated throughout, testified that Miliotti only stood in the doorway and never entered the fort.
We find, as a matter of law, that the evidence is insufficient to support a finding that Miliotti was a major participant in the attempted robbery or burglary and that he acted with a reckless indifference to human life.
As to appellant Miliotti, the evidence is insufficient to support the finding of a Penal Code section 190.2(d) special circumstance.

XVI. Cruel or Unusual Punishment

Each appellant contends that the sentence imposed constitutes cruel or unusual punishment contrary to the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Appellants argue that the punishment imposed is disproportionate to the nature of the crime involved.
The United States Supreme Court has held that in non-capital cases the disproportionality test has exceedingly rare application under the federal constitution. (Harmelin v. Michigan (1991) 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836.) It is undoubtedly with this in mind that the parties have directed their arguments to the California Constitution and the California Supreme Court opinion in People v. Dillon (1983) 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697.
*93 The power to define crimes and prescribe punishments is a legislative function. The court may not subvert the legislative process unless the statute prescribes a penalty which is so severe in relation to the crime as to violate the constitutional prohibition against cruel or unusual punishment. The basic test "is whether the punishment is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (People v. Dillon, supra, 34 Cal.3d at p. 478,194 Cal.Rptr. 390, 668 P.2d 697.)
"The main technique of analysis under Dillon is to examine the nature of the offense and the nature of the offender. (34 Cal.3d at p. 479, 194 Cal.Rptr. 390, 668 P.2d 697.) With respect to the nature of the offense, the court considers the offense not only in the abstract but also the facts of the crime in the particular case, `including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' (Ibid.) With respect to the nature of the particular person before the court, the question is whether the punishment is `grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' (Ibid.)" (People v. Young (1992) 11 Cal.App.4th 1299, 1308, 15 Cal.Rptr.2d 30; In re Lynch (1972) 8 Cal.3d 410, 425-428, 105 Cal.Rptr. 217, 503 P.2d 921; People v. Weddle (1991) 1 Cal.App.4th 1190, 1195-1200, 2 Cal.Rptr.2d 714.)
The majority opinion in Dillon remains the law of this state and is controlling in this case. Generally, there are factual similarities between this case and Dillon. The majority of the California Supreme Court in Dillon appears to have been particularly concerned with the personal characteristics of defendant Dillon, to wit: age, maturity, absence of a criminal history and his individual culpability in the crime. Accordingly, each appellant will be considered individually.
Jason at the time of the crimes was legally an adult. He was four months over the age of eighteen years. His criminal record involved a non-detained juvenile petition for vandalism/graffiti (1993) and a pending misdemeanor for receiving stolen property (Dismissed by the trial court after sentencing, herein). Jason frequently used alcohol and marijuana. He experimented with other drugs. Jason was the victim of physical and emotional abuse by a stepfather.
Jason was the perpetrator of the Moulder incident, which occurred within an hour before the crimes under consideration. He was an active participant in the burglary and attempted robbery. Jason is the person who carried and drew the knife, inflicted multiple, serious wounds upon McLoren and struck the fatal blows to Farris. The punishment imposed upon Jason, life without possibility of parole, is neither cruel or unusual.
Hein was at the time of the crimes legally an adult. His age was eighteen years, four months. His criminal record involved one juvenile diversion for shoplifting. Hein was a habitual user of drugs and alcohol. He was an active participant in the later intimidation phase of the Moulder incident. He was an active participant in the burglary and attempted robbery. He was physically involved in the fight with McLoren and beat Farris in the head and face after Farris had been stabbed. The punishment imposed upon Hein, life without possibility of parole as an aider and abettor in a felony murder, does not rise to the level of cruel or unusual punishment under the Dillon test.
Appellant Micah was fifteen years old at the time of the crimes. His juvenile record was for burglary and malicious mischief/vandalism in 1990 (diverted); battery in 1992 (diverted); runaway in 1993 (counseled and released); entry on school grounds without registering and battery in 1994 (nondetained petition). Micah was a frequent user of alcohol and drugs. He *94 was a disciplinary problem and truant in his schools. He was diagnosed with attention deficit disorder (A.D.D.) and had suffered physical abuse by his stepfather. Micah actively participated in the later intimidation phase of the Moulder incident.
Micah led the group foray into the McLoren property and into the fort. He attempted to open the locked desk drawer containing marijuana and money. He shouted the intimidating words demanding the keys from McLoren and was the first of the appellants involved in the physical fight, which culminated in the stabbing of McLoren and death of Farris.
Micah, although two years younger than defendant Norman Dillon (fifteen years vs. seventeen years), was not the immature, criminal record free youth who was the subject of Dillon. Although not a hardcore criminal, Micah's record consists of four law enforcement contacts, including informal probation, beginning when he was ten years old. Arguably, Micah was headed in the direction of serious criminality. On May 22, 1995, he arrived there when Farris died.
The facts in Dillon involve a sudden, frightened, panicky, quick turn and firing of fatal shots at a distant victim who was armed with a shotgun. The facts involving Micah are distinguishable. Micah knowingly became involved in an up-close and personal (to McLoren) burglary and attempted robbery, which quickly evolved into hand-to-hand, nose-to-nose, person-to-person physical fighting with unarmed persons, which in turn quickly escalated into a stabbing and killing by Micah's brother, Jason. Such facts do not give rise to the "exquisite rarity" of a finding that the sentence imposed on appellant Micah was grossly disproportionate to the crime committed and his culpability therein. (People v. Weddle, supra, 1 Cal.App.4th at pp. 1195-1200, 2 Cal.Rptr.2d 714.) Imposition of a sentence of 29 years to life does not constitute cruel or unusual punishment (Cal. Const., art. I, § 17.)
Miliotti was seventeen years old at the time of the crimes. He was eleven days away from his eighteenth birthday. His only previous law enforcement contact was a juvenile curfew violation. Miliotti frequently used alcohol and marijuana. Although the jury found him to be more than merely present as a passive observer, the evidence of the extent of Miliotti's involvement in the events at the fort is equivocal and contradictory.
Both Dillon and Miliotti were seventeen-year-old high school students at the time of their respective crimes. Both Dillon and Miliotti had no criminal record. Miliotti's involvement in the crimes herein was substantially less than that of defendant Norman Dillon, who planned, organized the crime, and was the actual killer in People v. Dillon, supra, 34 Cal.3d at pp. 451-452, 500-501, 194 Cal.Rptr. 390, 668 P.2d 697.
Defendant Norman Dillon was convicted of first degree felony murder and attempted robbery and was sentenced to life in prison (a parole eligible sentence). The majority of the California Supreme Court held, "... in the circumstances of this case the punishment of this defendant by a sentence of life imprisonment as a first degree murder violates article I, section 17, of the Constitution...." (Id. at p. 489, 194 Cal.Rptr. 390, 668 P.2d 697.)
Appellant Miliotti was convicted of burglary, attempted robbery and first degree felony murder plus special circumstance. He was sentenced to prison for life without possibility of parole plus four years. (An even more severe punishment than the parole eligible sentence imposed on Dillon.) The doctrine of stare decisis requires that we adhere to the decision in Dillon and find that the Miliotti sentence "... in the circumstances of this case ... violates article I, section 17, of the (State) Constitution ..." and is contrary to the prohibition against cruel or unusual punishment. (Id, at p. 489, 194 Cal.Rptr. 390, 668 P.2d 697.)
*95 As discussed above, the evidence is sufficient to support Miliotti's conviction of first degree murder committed in the course of a burglary and attempted robbery, but insufficient to support the Penal Code section 190.2(d) special circumstance. However, in accordance with Dillon (id. at p. 489, 194 Cal.Rptr. 390, 668 P.2d 697), the degree of Miliotti's murder conviction must be reduced to murder in the second degree. (Miliotti's claim that the trial court abused its discretion in a so-called Dillon hearing is moot.)
The doctrine of stare decisis has been clearly stated by the California Supreme Court: "Under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction.... The decisions of this court [California Supreme Court] ... must be followed by all the state courts of California.... Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.... [Citations.]" (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 454, 456, 20 Cal.Rptr. 321, 369 P.2d 937.) As to each appellant individually, we have adhered to the decision in People v. Dillon, supra, 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697. We respectfully urge that the California Supreme Court review the Dillon decision in the context of this case.

DISPOSITION
As to appellants Jason Holland, Brandon Hein and Micah Holland, the judgments are affirmed.
As to appellant Anthony Miliotti, the judgment is affirmed on the convictions of burglary and attempted robbery. The special circumstance finding (Pen.Code, § 190.2, subd. (d)) is stricken. As to the conviction of murder, the judgment is modified by reducing the degree of the crime to murder in the second degree and, as so modified, is affirmed. The cause as to appellant Anthony Miliotti is remanded to the trial court with directions to arraign and pronounce judgment accordingly.
LILLIE, P.J., and WOODS, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions directed to be published follow.
[**] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[***] Assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.
[] See footnote *, ante.