# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRANDON WADE HEIN,
              *Petitioner-Appellant,*

v.

WILLIAM JOSEPH SULLIVAN, Warden
of California Correctional
Institution, at Tehachapi,
California, Substituted for Michael
G. Yarborough,
              *Respondent-Appellee.*

No. 07-56277

D.C. No.
CV-04-03502-SJO

---

TONY MILIOTTI,
              *Petitioner-Appellant,*

v.

JIM HALL,
              *Respondent-Appellee.*

No. 07-56288

D.C. No.
CV-04-03491-SJO

---

JASON SKIP HOLLAND,
              *Petitioner-Appellant,*

v.

AL SCRIBNER, Substituted for
George A. Ortiz,
              *Respondent-Appellee.*

No. 07-56365

D.C. No.
CV-04-03416-SJO

5451

Micah Holland,
　　　　　　*Petitioner-Appellant,*

　　　　　　v.

Derral G. Adams,
　　　　　　*Respondent-Appellee.*

No. 07-56367

D.C. No.
CV-04-03407-
SJO(MLG)

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
October 7, 2009—Pasadena, California

Filed April 12, 2010

Before: Andrew J. Kleinfeld and Richard C. Tallman,
Circuit Judges, and David G. Trager,* District Judge.

Opinion by Judge Trager

*The Honorable David G. Trager, United States District Judge for the
Eastern District of New York, sitting by designation.

## COUNSEL

William J. Genego, Santa Monica, California, for petitioner-appellant Brandon Hein.

Tracy Dressner, La Crescenta, California, for petitioner-appellant Tony Miliotti.

Manny A. Abascal, Daniel R. Seltzer and Scott P. Lawrence for petitioner-appellant Micah Holland.

Erwin Chemerinsky, Durham, North Carolina, for petitioner-appellant Jason Holland.

Victoria B. Wilson, Supervising Deputy Attorney General, Office of the California Attorney General, Los Angeles, California, for the respondents-appellees.

## OPINION

TRAGER, District Judge:

In 1996, Brandon Hein, Micah Holland, Jason Holland[1] and Tony Miliotti, were convicted, after being tried together in California state court, of crimes relating to the 1995 attempted robbery of Michael McLoren, a small-time marijuana dealer, and the stabbing death of McLoren's friend, James Farris. All the participants were teenagers at the time of the stabbing, and Miliotti and Micah, who were juveniles at the time of trial, were tried as adults. The jury had been instructed on felony murder and found all four petitioners guilty of that crime. Jason, who admitted at trial that he stabbed Farris, was also convicted of assault with a deadly weapon. After bringing unsuccessful appeals and habeas corpus petitions in state court, petitioners filed habeas petitions in federal court, which were denied.

Before trial, the prosecution had given the lawyer for McLoren, its only eyewitness to the stabbing and a surviving victim, a letter in which it promised not to use against him anything he told the State about his marijuana dealing. Petitioners' principal challenges — suppression in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), presentation of false testimony and prosecutorial misconduct — stem from the prosecution's alleged non-disclosure of that letter to certain defense counsel. Because, in light of the record from the two-month-long jury trial, the letter was not the decisively impeaching evidence petitioners make it out to be and

---

[1]To avoid confusion, we generally refer to brothers Micah and Jason Holland by their first names only.

attempted robbery was the only plausible theory for the instigation of the fight that culminated in Farris's death as well as McLoren's stabbing, petitioners fail to establish the prejudice required to overturn their convictions. Accordingly, to the extent the letter was not disclosed, we are satisfied its disclosure would have had little impact on the outcome of the trial. Likewise, any improper argument made by the prosecution in summation did not prejudice petitioners. Finally, petitioners' claim that McLoren testified falsely finds no basis in the record. Therefore, we affirm the district court's judgment denying habeas relief.

## BACKGROUND

After a joint trial, a jury found petitioners guilty of attempted robbery, burglary and felony-murder. The prosecution's theory was that a fight between petitioners on one side and McLoren and Farris on the other had ensued after petitioners entered McLoren's grandparents' property and attempted to rob him of marijuana he kept for sale. Petitioners contended that they were on the property to buy marijuana from McLoren and that a fight had spontaneously erupted. Thus, petitioners' felony-murder convictions hinged on whether the jury believed the prosecution's theory that petitioners entered the property in order to rob McLoren of his marijuana stash rather than petitioners' theory that the encounter was an attempted drug buy that went sour.

### The Attempted Robbery

### (1)

Petitioners' convictions were attributable, in large part, to the trial testimony of McLoren. McLoren, who was sixteen at the time of the stabbing, testified that he maintained a makeshift shed, which he referred to as "the fort," in the backyard of his grandparents' house in Los Angeles County. The fort was furnished with a couch, a bed and a desk. McLoren kept

marijuana for sale in a drawer of his desk, which he kept locked. He also kept a television, VCR and two video game consoles in the fort, all powered by an extension cord that ran to the house. The fort was used as a place to smoke marijuana and watch movies. McLoren also sold marijuana from the fort.

McLoren testified that he spent much of the afternoon of May 22, 1995, at the fort watching movies and smoking marijuana with his girlfriend and Farris, who was fifteen at the time. McLoren's girlfriend left sometime between five and seven o'clock.

At around 7:15 p.m., McLoren and Farris were hitting a punching bag outside the fort when McLoren saw petitioners, Hein, seventeen years-old, Micah, fifteen, Jason, eighteen, and Miliotti, seventeen, jump over his grandparents' fence and into the backyard. McLoren knew petitioners from prior encounters and said to Farris: "Looks like trouble." He then called out to Micah: "What's up, Micah?"

According to McLoren, petitioners, with Micah in the lead, approached the fort without saying a word. Micah walked past McLoren, entered the fort, started pulling on the locked desk drawer and demanded the key. He was quickly followed into the fort by McLoren, who, in turn, was followed by Jason and Hein. (The time between McLoren's entrance and Jason and Hein's entrance was estimated variously on direct to be three, five and ten seconds.) Micah then shouted at McLoren: "Give me the keys, ese. You want shit with the Gumbys, ese?" McLoren understood "Gumbys" to be the name of a gang and "ese" to be a Mexican slang term "used before a fight ensues."

Micah, Jason and Hein then began punching McLoren. McLoren put his head down, and Micah, Jason and Hein punched him about ten times. Farris then entered. McLoren managed to place Micah into a headlock. McLoren proceeded

to elbow Micah in the neck and back of the head. Seeing his brother being elbowed, Jason ran at McLoren, who kicked Jason in the nose. Someone then placed McLoren into a headlock and he felt himself being stabbed. He was stabbed three more times and thrown against the wall of the fort. McLoren, lying prone on the ground, looked up and saw Hein punching Farris, who was sitting on the couch.

McLoren then got up and ran to his grandparents' house. He was followed by Farris who reached the house immediately after. McLoren's mother was inside and asked what happened. McLoren told her: "They were trying to steal my stuff, and they stabbed us."

Farris collapsed on a table. He was still breathing when the paramedics arrived. After the paramedics attempted to revive Farris, McLoren heard one of them say: "He stopped breathing." Farris was pronounced dead at McLoren's house. He died of a stab wound to the main chamber of the heart. Los Angeles County Sheriff's deputies also responded and commenced the homicide investigation. All four members of the Holland group were ultimately charged.

### (2)

Jason Holland testified in the defense's case-in-chief and admitted stabbing both Farris and McLoren. On May 22, Jason, after drinking alcohol and smoking marijuana for several hours, drove with petitioners and his friend Chris Velardo in Velardo's truck to McLoren's house. When they arrived, petitioners exited the truck while Velardo remained in the driver's seat. Jason asked Velardo why they were there, to which Velardo replied: "We're going to get some weed." Jason took that to mean that they were going to buy some marijuana. Resolution of the true purpose of seeing McLoren was the key issue the jury had to resolve.

When Jason jumped the fence, Micah was already in the yard about twenty feet ahead of him. As Micah approached

the fort, Jason heard McLoren say: "What's up Micah?" Micah said nothing and waved. Micah and McLoren then entered the fort and Farris stood in the doorway facing out.

Jason could see inside the fort and observed Micah and McLoren facing each other about a foot apart. Micah and McLoren then dropped their heads and started fighting. Jason and Hein entered the fort and joined the fight.

Jason testified that he stabbed Farris twice after Farris spun him around. He also testified that the other petitioners did not believe that he had stabbed McLoren and Farris until he showed them the bloody knife as they fled the crime scene.

**(3)**

Petitioners point to a number of occasions where McLoren provided inconsistent information to the police about the object of the alleged attempted robbery. For instance, before McLoren was taken to the hospital on the night of the stabbing, he was questioned briefly by the police and told them that petitioners had come for his electronic equipment.

Then, four days after the stabbing, in a recorded interview, McLoren was questioned at the hospital by Sheriff's Homicide Detectives Robert Tauson and William Neumann. McLoren denied ever having sold marijuana even though he received assurances from Detective Tauson that the authorities had no interest in prosecuting him. However, McLoren did admit keeping some marijuana for personal use. Consistent with this version of events, he initially told the detectives on May 26, 1995, that he thought petitioners had come for his video games, adding that it was his opinion that petitioners were "just bored" and were "going to come up on a bunch of stuff," such as "a free T.V., VCR . . . and maybe even like a little bit of marijuana to go with."

McLoren did not admit selling marijuana until he met with Deputy District Attorney Jeffrey Semow ("DDA Semow" or

"Semow") on July 10, 1995. In an *in camera*, *ex parte* pretrial hearing, Semow recalled meeting with McLoren's lawyer, Ellery Sorkin, on that day. Semow wanted to "see if Mr. McLoren would testify without transactional immunity." Sorkin believed that Semow was building a marijuana prosecution against McLoren. To allay Sorkin's fears, Semow drafted a letter ("July 10 letter" or "immunity letter") to Sorkin promising that "nothing [McLoren] tells me or the investigating officers about marijuana will be used in any way against him."

### The Wallet Theft

About an hour before the stabbing, Velardo drove petitioners to Gates Park in nearby Calabasas where they intended to get drunk. As they were pulling into the parking lot, a wallet sitting in a van caught Jason's eye. The van belonged to Alyce Moulder, who was playing with her children in the park. Jason opened the door of the unlocked van, took the wallet and closed the door, which Moulder witnessed. Jason jumped into the bed of the truck and told Velardo to drive.

Velardo then sped out of the parking lot as Moulder yelled: "Hey don't take my wallet. I don't have any money in it. I need my driver's license." Jason rifled through the wallet, which indeed held no money, and threw it onto the road.

After about five minutes, Moulder collected her children, got into her van and followed Velardo's truck. She found the truck parked at a shopping mall soon after. She pulled up behind the truck, parked and walked over to it. Only Velardo was in the truck at that time. Moulder confronted him, grabbing his collar and demanding her wallet. He said he did not have her wallet.

While Moulder was still arguing with Velardo, petitioners approached them from across the parking lot. Moulder saw that Hein was holding something in his hand that she recog-

nized as a wheel locking device known as "The Club." Petitioners threatened Moulder, screaming at her to leave. She slowly backed up toward the driver's side door of her van and entered it. As she did so, Hein spat on her windshield. Moulder then pulled away, and Micah threw something which hit her van.

## Procedural History

Petitioners were convicted of burglary, attempted robbery and felony murder with a special circumstance[2] and appealed. The California Court of Appeals denied all of petitioners' claims except Miliotti's claim that insufficient evidence supported the special circumstance finding against him. *Hein*,

[2]Section 190.2(a) of the California Penal Code provides a penalty of death or life imprisonment for defendants who are found guilty of first-degree murder if certain special circumstances are found to be true beyond a reasonable doubt by the finder of fact. One of the special circumstances is that the murder was committed during the commission of one of the felonies enumerated in section 190.2(a)(17), which include robbery and burglary. Section 190.2(d) authorizes the death penalty or life imprisonment for any defendant other than the actual killer who "with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of" one of those felonies. In petitioners' trial, the jury was instructed that:

> [I]t could only find the special circumstance to be true if they found beyond a reasonable doubt (1) that the defendant with the intent to kill aided and abetted any actor in the commission of the first degree murder; *or*, (2) that the defendant with reckless indifference to human life *and* as a major participant aided "or" abetted in the commission of the attempted robbery and burglary which resulted in the death of Farris.

*People v. Hein*, 104 Cal. Rptr. 2d 85, 91-92 (Cal. Ct. App. 2001). The jury found the special circumstance to be true beyond a reasonable doubt. *Id.* at 87. The record is silent as to which condition of the special circumstance the jury found to be true. However, it appears that the jury found true — and the California Court of Appeals dwelled on — the second condition (i.e., that petitioners "with reckless indifference to human life" and as "major participant[s]" aided or abetted in the commission of the attempted robbery and burglary) at least as to Micah, Hein and Miliotti.

104 Cal. Rptr. 2d at 92. The court accordingly reduced his murder conviction to second degree. *Id.* at 95. He was resentenced to fifteen years to life plus four years. Regarding petitioners' claims of prosecutorial misconduct, the court found that the prosecution "contravened the trial court order excluding gang evidence" and made statements which were "unnecessary, professionally questionable and highly risky." But the court held that reversal was not necessary because a better result would not have been reasonably probable had the comments not been made.

Since petitioners claim that they did not find the July 10 letter until after their direct appeal had concluded, their habeas petitions to the California Supreme Court raised the issues relating to the letter for the first time. The court summarily denied the petitions. Petitioners filed timely petitions for habeas corpus in federal court pursuant to 28 U.S.C. § 2254. The magistrate judge's 78-page report and recommendation, which the district court adopted, found that none of the claims raised warranted habeas relief. Micah and Hein are currently serving prison sentences of twenty-nine years to life,[3] Miliotti is serving a sentence of nineteen years to life and Jason is serving a sentence of life without parole.

## DISCUSSION

Petitioners raise five claims on appeal: (1) suppression of evidence in violation of *Brady*, (2) presentation of false testimony, (3) prosecutorial misconduct, (4) cumulative error and (5) ineffective assistance of counsel. Their federal due process claims arising out of their California state prosecution are subject to the stringent standard of review provided by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254.

---

[3]After briefing was completed, Hein's murder sentence was commuted from life without parole to a term of twenty-five years to life. His total custodial sentence is now twenty-nine years to life.

We review a district court's decision to deny habeas corpus de novo and its findings of fact for clear error. *Richter v. Hickman*, 578 F.3d 944, 951 (9th Cir. 2009) (*en banc*), *cert. granted sub nom. Harrington v. Richter*, 559 U.S. ___ (Feb. 22, 2010). Where, as here, "no state court has explained its reasoning on a particular claim, we conduct an independent review of the record to determine whether the state court's decision was objectively unreasonable." *Richter*, 578 F.3d at 951 (internal citation and quotation marks omitted).

### (1)

### Due Process Violations: *Brady*, False Evidence and Prosecutorial Misconduct

Three of petitioners' claims — *Brady*, false evidence and prosecutorial misconduct — are closely related in that they all stem principally from the July 10 letter. To wit, petitioners contend that if the prosecution had not committed a *Brady* violation as to the July 10 letter, it would not have been able to present false evidence concerning McLoren's immunity, or, in the alternative, petitioners would have been able to impeach McLoren with the letter once he gave false testimony. Similarly, if petitioners possessed the letter, they claim, the prosecution would not have been able to make certain improper arguments in summation regarding McLoren's criminal liability without defense counsel pointing out their impropriety. In sum, petitioners argue that, when viewed together with McLoren's challenged testimony and the prosecution's improper summation, the suppression of the letter affected their convictions by rendering the trial unfair.

We discuss *Brady*, false evidence and prosecutorial misconduct challenges individually to determine, respectively, whether the prosecution failed to disclose the July 10 letter, presented false evidence or made improper argument in summation. Although we find that the prosecution did not present false evidence, we agree with petitioners that the prosecution

failed to disclose the letter to Jason and Hein and made improper comments in summation. Because petitioners' *Brady* and prosecutorial misconduct claims require similar analyses for evaluating prejudice[4] and encompass overlapping considerations, we analyze their effect on petitioners' convictions collectively and conclude that, to the extent the prosecution committed error, it did not prejudice petitioners.

### a. *Brady* Violation

### i. Applicable Law

**[1]** Hein, Jason and Micah argue that the prosecution's failure to disclose favorable evidence, including McLoren's immunity letter, constituted a *Brady* violation.[5] "The govern-

---

[4]Although the tests for evaluating the prejudicial impact of these violations each use a distinct formulation, they both examine the fundamental fairness of the proceeding. A finding of prejudice, thus, requires that the conduct have some impact on the outcome of the proceeding — i.e., a reasonable probability that the result of the proceeding would have been different or that it so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This means that we cannot review each instance of non-disclosure or prosecutorial misconduct in isolation, but rather must view them collectively in light of the entire record. *Kyles*, 514 U.S. at 436; *Darden v. Wainwright*, 477 U.S. 168, 182 (1986).

[5]Petitioners also allege that the prosecution failed to turn over another piece of favorable evidence. Detective Tauson took a statement from a friend of Velardo's, Katren Anderson, who signed the statement. A copy of the statement was turned over to petitioners in which Anderson said that Velardo had told her that, on the day of the stabbing, he and petitioners were going to "get some bud." However, petitioners speculate that another version of the statement existed which indicated that Velardo had said they intended to "buy some bud"; this alleged, other statement was never found. Petitioners' argument appears to be based on a misunderstanding, for it is probable that no separate version of the statement existed. Petitioners rely on the transcript of an *in camera*, *ex parte* hearing at which Detective Tauson discussed the statement he took from Anderson. At the hearing, Tauson told the court that Anderson said: "[T]hey were going to

ment violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is 'material')." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005). Suppressed evidence must be considered "collectively, not item by item," *Kyles*, 514 U.S. at 436, and is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

The district court found that petitioners had satisfied the first two *Brady* factors (i.e., that the evidence was favorable to petitioners and that the State had suppressed it). However, it found that petitioners had not satisfied the third (i.e., that the suppressed evidence was material).

### ii.   Whether the Prosecution Suppressed the Letter

At a juvenile fitness hearing held on July 24, 1995, and attended by Micah, Miliotti and Velardo, DDA Semow, responding to a request for discovery, orally disclosed the substance of the July 10 letter:

---

buy some bud." However, it is apparent that Tauson was paraphrasing the very statement the prosecution disclosed to petitioners but said "buy" instead of "get." The fact that the statement disclosed to petitioners and the one described by Detective Tauson in the *in camera* hearing both bore Anderson's signature leads us to believe that the statements were one and the same. In any event, although the defense had Anderson's statement through discovery, they neither called her as a witness nor cross-examined Tauson regarding her statement.

> There is no immunity agreement for Mr. McLoren,
> other than I promised him in writing that nothing he
> said in this case about Marijuana, [sic] would be
> used as evidence against him. That is it.

Counsel for Miliotti and Micah, as well as Velardo, were
present. (Velardo pled guilty before trial.) Curt Leftwich,
Miliotti's counsel, was the only attorney present at this hear-
ing to also represent his client at trial. Leftwich did not cross-
examine McLoren regarding his use immunity in the subse-
quent superior court jury trial.

Semow also apparently mentioned the letter later at a pre-
trial discovery hearing held on September 15, 1995, at which
all trial counsel were present:

> Those will be available at 1:30: A July 10 letter from
> the district attorney [to McLoren's counsel]; an
> August 11 letter consisting of two pages; what
> appears to be a misdemeanor complaint, 95M00754,
> attached documents, a police report. A supplemen-
> tary report bearing the number 495-00136-2222-072;
> and another complaint report bearing a D.R. number
> of 195-06108-2223-189. So that can be disclosed to
> counsel.

Although all counsel attended this hearing, petitioners, with
the exception of Miliotti, claim their counsel did not receive
the July 10 letter.

In early 2002, Miliotti's habeas counsel found a copy of the
July 10 letter and the transcript of the juvenile fitness hearing
in the file Leftwich gave to Miliotti's family after the trial and
sent the transcript and a copy of the letter to Leftwich. In a
declaration dated July 10, 2002, Leftwich stated that he did
not recall ever having seen the letter. But he stated that the
transcript of the juvenile fitness hearing refreshed his recol-

lection that he had learned of the letter's existence when Miliotti's case was in juvenile court.

Trial counsel for Hein and Micah also submitted declarations, in which they claimed not to recall receiving the letter. Jill Lansing, Hein's trial counsel, submitted a declaration in which she stated that she had no recollection of receiving the letter or having been told of any immunity agreement. She attached three discovery receipts from 1995, two of which predate the September 15, 1995, pretrial discovery hearing. None of the three referenced the July 10 letter. The receipts also do not reflect that counsel received any of the other material mentioned by Semow at that hearing.[6] Notably, petitioners do not claim that the prosecution failed to disclose those other documents.

James Sussman represented Micah at trial but not at the juvenile fitness hearing. In a signed declaration, Sussman stated that he was unaware of the July 10 letter. Sussman prepared a writ challenging the findings of the juvenile court, but this was before the transcript of the July 24 juvenile fitness hearing had been made available. Although Semow had disclosed the entire contents of the letter on the record at that hearing, and Sussman admitted that he later reviewed the transcript for impeachment purposes after the writ was denied, he "did not 'pay attention to the discussions or arguments of counsel.' "

In the court below, the State did not object to the magistrate judge's factual finding that none of the petitioners, with the exception of Miliotti, received the July 10 letter or were

---

[6]Because the record reflects only oral disclosure of the letter at the juvenile fitness hearing, Miliotti's counsel, Leftwich, probably did not receive a copy of the letter then but rather after the September 15, 1995, discovery hearing. It, thus, seems odd that, despite Semow's explicit statement that counsel should pick the letter up at 1:30 the day after the discovery hearing, only Leftwich appears to have actually received it.

apprised of its existence. However, the State now correctly argues that the prosecution fulfilled its *Brady* obligation to Micah by disclosing the existence of the July 10 letter to Micah's counsel at the juvenile fitness hearing.

**[2]** The State concedes that Hein and Jason meet the second *Brady* element. The magistrate judge did not dwell on this element of the *Brady* test, finding that the agreement was suppressed as to Micah as well as to Jason and Hein. After citing *Banks v. Dretke*, 540 U.S. 668, 695-96 (2004), for the proposition that the Supreme Court's "decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed," the magistrate judge determined that the immunity deal was not disclosed because "[t]he existence of the letter was not made clear to trial counsel." *Holland v. Adams*, No. CV-04-3407-SJO(MLG), slip op. at 20 (C.D. Cal. filed Apr. 3, 2007).

**[3]** *Banks* does not support the magistrate judge's finding as to Micah. Semow disclosed the July 10 letter on the record at the juvenile fitness hearing attended by Micah, Miliotti and Velardo. Even though Sussman, Micah's trial counsel, was not present at that hearing, he read the transcript, explaining that he did not "pay attention to the discussions or arguments of counsel." Thus, the record supports a finding that Micah's failure to discover the July 10 letter was the result of his defense counsel's carelessness, rather than the prosecution's alleged misconduct. In reality, Micah is seeking to advance an ineffective assistance of counsel claim masquerading as a *Brady* claim. Micah is no doubt trying to cast a patina of prosecutorial misconduct on his counsel's failure to follow up on Semow's disclosure at the juvenile fitness hearing.[7]

---

[7]We also note that it is unusual that Micah's counsel at the juvenile fitness hearing did not notify Sussman of the immunity letter.

**[4]** As to Jason and Hein, the record, as it stands, supports the conclusion that disclosure was not made to them although that non-disclosure, if it occurred, was likely inadvertent. At a pretrial discovery hearing, attended by all trial counsel, Semow mentioned that "[a] July 10 letter from the district attorney [to McLoren's counsel]" — presumably, the immunity letter — would be available "at 1:30" the next day. However, it was apparently not included in the materials disclosed by the prosecution. In addition, Jason and Hein did not participate in the juvenile fitness hearing, and the record is silent as to whether transcripts of that hearing were made available to them. Jason and Hein, therefore, satisfy the second *Brady* element. Before turning to the materiality of the non-disclosure, we consider whether the prosecution presented false evidence or made improper arguments in summation.

### b. False Evidence

**[5]** Petitioners contend that the prosecution presented false evidence and failed to correct false testimony in violation of the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959). To prevail on a *Napue* claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony [or evidence] was actually false, and (3) that the false testimony [or evidence] was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). False evidence is material "if there is any reasonable likelihood that the false [evidence] could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678 (internal citation and quotation marks omitted). We find that McLoren did not testify falsely, and, as such, his statements do not factor into the materiality analysis which follows our discussion of prosecutorial misconduct.

There are two parts to petitioners' claim. First, that the testimony of the State's principal witness, McLoren, was false. Second, the manner in which Deputy District Attorney

Michael Latin ("Latin" or "DDA Latin"), who shared trial duties with Semow, questioned McLoren was misleading and could be characterized as presenting false evidence. Regarding Latin's line of questioning, petitioners especially take issue with his failure to specifically ask McLoren about the July 10 letter.

As to McLoren's testimony, although a few of McLoren's statements at trial were incomplete, the critical point of McLoren's testimony, to wit, that he could still be prosecuted for marijuana possession or sale, was true. To the extent that McLoren failed to mention the July 10 letter, his testimony, viewed in its entirety, conveyed to the jury an accurate picture of his legal situation (i.e., that, although he would probably not be prosecuted, he was not given transactional immunity). Similarly, *Napue* imposed no duty on Latin to clarify McLoren's answers to open-ended questions about his willingness to be a witness or to specifically question him about the July 10 letter.

On appeal, as they did below, petitioners highlight seven statements of McLoren that they claim were false.[8] Because

---

[8]The district court, in its unpublished opinion adopting the magistrate judge's report and recommendation, held that certain statements made by McLoren were false (but immaterial), but it is unclear what, exactly, the magistrate judge found false. First, the magistrate judge set forth the seven statements that petitioners challenged, then found that McLoren's intimations that he did not receive immunity were "clearly false." This suggests that the magistrate judge found false a number of instances where McLoren cited motivations to testify other than use immunity. *Holland*, No. CV-04-3407-SJO(MLG), slip op. at 36. Yet, to support his falsity determination, the magistrate judge cited only two pages of the transcript which contained two statements petitioners argued were false: that McLoren believed that what he told Detectives Tauson and Neumann could be used against him and that he received no assurances about prosecution from his attorney. For many of the reasons discussed *infra*, the magistrate judge's finding of falsity on these two statements is unsustainable; McLoren's interview with Detectives Tauson and Neumann in which the detectives assured him that he was not the priority for prosecution in

McLoren was given only use immunity and was never specifically asked whether his trial testimony or the statements he gave to the authorities after July 10, 1995, could have been used against him, none of these statements were false.

According to petitioners, McLoren testified falsely by asserting that: (1) he still faced potential prosecution and (2) he was willing to testify even though some of his testimony would incriminate him.

First, on cross by Lansing, Hein's trial counsel, McLoren testified about what Detectives Tauson and Neumann told him about their intentions to prosecute him:

> [Lansing]: And at that time they basically told you that they weren't going to prosecute you if you admitted selling, if you admitted —
>
> [McLoren]: They said they didn't have an interest in prosecuting me.
>
> [Lansing]: And what did you take that to mean?
>
> [McLoren]: That I wasn't the priority.

a robbery-murder case predated the July 10 letter which granted McLoren immunity, and, since McLoren was given only use immunity, he was still subject to prosecution.

The magistrate judge then concluded that McLoren's "general denial of any immunity agreement, when coupled with the prosecutor's emphasis upon his altruistic motivation for testifying, can be characterized for purposes of this analysis as false evidence." *Id.* at 37. Assuming the magistrate judge found falsity throughout the other five statements petitioners challenged, his finding is incorrect. McLoren was asked why he decided to be candid with Semow, not whether his post-immunity statements could have been used against him. His answers thus do not amount to "general denial[s]" of immunity.

| [Lansing]: | That you wouldn't be prosecuted; is that right? |
|---|---|
| [McLoren]: | Not that I wouldn't be, that I probably wouldn't be. They reserved the option. |
| [Lansing]: | But they suggested to you that that probably wasn't going to happen; is that correct? |
| [McLoren]: | Yes. |

Lansing revisited the issue on re-cross:

| [Lansing]: | Was it your state of mind that the things you told Detective Neumann and Detective Tauson would not be used against you? |
|---|---|
| [McLoren]: | No. |
| [Lansing]: | You hired a lawyer; is that correct? |
| [McLoren]: | Yes. |

. . . .

| [Lansing]: | And did that lawyer give you any assurances in terms of whether you would be prosecuted or not? |
|---|---|
| [McLoren]: | No, not really. |
| [Lansing]: | And have you been prosecuted? |
| [McLoren]: | No. |

**[6]** As an initial matter, McLoren's testimony regarding his understanding that his statements to Detectives Tauson and Neumann could have been used against him was clearly not false. Because McLoren had not been given any immunity at the time of the interview with the detectives on May 26, 1995, this question is irrelevant to the issue of whether he gave false testimony about the July 10 letter.

**[7]** Next, McLoren's testimony about whether he faced potential prosecution was not false because he was given only use immunity. The plain language of the July 10 letter supports this conclusion. The agreement explicitly promised McLoren that "nothing he tells [Semow] or the investigating officers about marijuana will be used in any way against him."[9] Although McLoren understood and admitted at trial that charges for marijuana dealing were unlikely, the prosecution did not promise that it would never prosecute McLoren for it. Therefore, McLoren accurately testified that the State "reserved the option" to prosecute him and there is no basis for saying that he was lying when he testified that his lawyer never assured that he would not be prosecuted.

---

[9]Despite the plain language of the July 10 letter, petitioners argue that McLoren actually received transactional immunity because the California statute regarding immunity did not recognize use immunity until it was amended in 1996. The magistrate judge declined to address this argument.

Petitioners appear to be mistaken that use immunity was not recognized before 1996 in California. *See People v. Badgett*, 10 Cal. 4th 330, 363 (1995) (finding that trial testimony given pursuant to an agreement granting use immunity was not coerced). Furthermore, the statute they rely on, section 1324 of the California Penal Code, addresses only immunity for judicially compelled testimony. *See Griego v. Superior Court*, 95 Cal. Rptr. 2d 351, 354 (Cal. Ct. App. 2000) (finding that section 1324 applies only when a witness is judicially compelled to testify in "felony proceedings or investigations before the court or the grand jury"). We do not read *People v. Brunner*, 108 Cal. Rptr. 501 (Cal. Ct. App. 1973), as broadly as petitioners do for the contrary position. Therefore, it appears that McLoren was, in fact, granted use immunity and still could have been prosecuted. In any event, we are discussing McLoren's understanding and not the state of the law.

Petitioners next allege that McLoren's testimony citing altruistic reasons for being candid with DDA Semow was false. Several times, on direct and redirect, McLoren was asked, with varying specificity, what had spurred him to be more forthcoming with DDA Semow than when initially questioned by Detectives Tauson and Neumann.

On direct examination, McLoren testified that he understood, from representations made by Detective Tauson at the hospital, that the State did not want to prosecute him for marijuana. McLoren was then asked:

> [Latin]: Since that initial interview with Detectives Neumann and Tauson, when questioned by either law enforcement officers or district attorneys, have you ever made any effort to hide the fact that you possessed or sold marijuana?
>
> [McLoren]: No.
>
> . . . .
>
> [Latin]: Are there any other reasons other than what Detective Tauson told you at the hospital that caused you to no longer want to hide the fact that you had marijuana?
>
> . . . .
>
> [McLoren]: Yes. My grandma told me just to take the drug charge and just bust them.

Later, while McLoren was still on direct, the following exchange occurred:

[Latin]: As you sit here and testify in this court, do you feel inhibited or deterred in any way from talking about your prior dealings with marijuana?

. . . .

[McLoren]: No. I feel fine talking about it.

[Latin]: Why? Can you explain why?

[McLoren]: Because it is something that I have to do.

[Latin]: Why?

[McLoren]: Because I want to get these guys that stabbed me and killed my best friend.

Then, on redirect, after he was asked why he felt ready to talk to the authorities about marijuana, the following exchange occurred:

[Latin]: What brought that about?

[McLoren]: My lawyer told me I wasn't going to be able to get these guys until I tell the whole truth.

[Latin]: Who did you talk to first . . . ?

[McLoren]: Jeff Semow

. . . .

[Latin]: You didn't know for sure whether you could trust Semow?

[McLoren]:          Yes.

Finally, while still on redirect, McLoren testified:

[Latin]:            Do you still feel uncomfortable talking about [your involvement with marijuana]?

[McLoren]:          Somewhat.

[Latin]:            Why are you talking about it anyhow?

[McLoren]:          Because it's more important to get these guys than drugs.

**[8]** Contrary to petitioners' contentions, none of these statements are false — and certainly not perjurious. McLoren was asked a series of open-ended questions about why he decided to be forthcoming on and after July 10, 1995 (e.g., "[What reasons] other than what Detective Tauson told you at the hospital [caused you to come forward]?"; "Can you explain why [you decided to come forward]?"; "What brought that about?"; "Why are you talking about it anyhow?"). None of these questions specifically addressed immunity, and McLoren's failure to mention use immunity cannot be described as false. Assuming that the grant of use immunity was one reason McLoren decided to speak to Semow, he never denied receiving it. Instead, he listed alternative reasons for his willingness to be a witness, none of which are facially false. Therefore, even if McLoren's failure to mention that use immunity played a role in his decision is viewed with some skepticism, petitioners fail to demonstrate its falsity.

Moreover, because the July 10 letter was addressed to Sorkin, McLoren's lawyer, and not to McLoren, and McLoren's awareness of it was not established by the state or district courts, we do not assume McLoren knew of the let-

ter's existence.[10] Although it is possible that Sorkin informed McLoren about the gist of the letter, the record is silent on exactly what, if anything, was communicated to McLoren.[11]

Arguably, the most colorable claim of falsity concerns McLoren's statement that his grandmother told him "just to take the drug charge and just bust" petitioners, but this claim fails as well. Petitioners do not contend that McLoren's grandmother never offered this advice. Rather, they appear to take issue with McLoren's testimony because, according to petitioners, it suggested that McLoren could have exposed himself to liability by speaking to Semow, which would not have been true. A broader look at the exchange in which the statement appeared is instructive. McLoren was asked what, other than Detective Tauson's assurance, "caused [him] to no longer want to hide the fact that [he] had marijuana." The question is vague as to time. Thus, if McLoren's grandmother offered the advice before July 10, 1995, McLoren could still have been risking criminal liability. But even assuming the statement was made after July 10, McLoren's answer was still not false because, as noted earlier, his understanding as to the existence of the July 10 letter has not been established. Moreover, McLoren's statement did not foreclose or diminish the possibility that he was granted use immunity. Thus, McLoren's testimony was not false.

---

[10]Although immunity agreements are often signed by the person being granted immunity, McLoren did not sign the July 10 letter.

[11]Although *Napue* prohibits the presentation of false evidence regardless of whether the witness is aware of its falsity, the testimony must still be actually false. *See Hayes v. Brown*, 399 F.3d 972, 980-82 (9th Cir. 2005) (*en banc*). In *Hayes*, the witness testified that he was still subject to criminal charges even though the prosecutor had made a secret deal with the witness's attorney to dismiss the charges and had instructed the attorney not to notify the witness. *Id.* at 980. Sitting *en banc*, we held that, under those circumstances, the prosecution had presented false evidence. *Id.* at 981. Here, by contrast, McLoren was asked why he was willing to testify — a matter that depended exclusively on his personal knowledge — not whether he had received use immunity.

Finally, petitioners interpret McLoren's statement that it was "more important to get these guys than drugs" to mean that he was willing to risk prosecution for marijuana crimes if it meant bringing petitioners to justice. However, in the context of McLoren's testimony about Detective Tauson's representation, a more plausible interpretation of McLoren's answer is that McLoren was stating that he was testifying at trial because the *prosecution* was concerned only about the murder and did not care about his relatively minor drug crimes. This interpretation comports with McLoren's testimony that he was told that he was not a priority.

**[9]** Turning to Latin's examination, neither his questions nor his failure to expand upon McLoren's answers were improper and may not have even been deliberate (at least in the case of his direct examination). As none of McLoren's answers to Latin's open-ended questions were false, Latin had no duty to clarify McLoren's answers or to question McLoren specifically about the use immunity he received. Moreover, since Latin had reason to believe that the letter was in the hands of the defense (and clearly was in the case of Miliotti), he might well have expected defense counsel to raise use immunity on cross if they thought it appropriate. Accordingly, we reject petitioners' claim that the prosecution knowingly presented false evidence.

## c. Prosecutorial Misconduct

Petitioners' final related claim is that the prosecution made statements in summation that violated due process. In evaluating allegations of prosecutorial misconduct, we consider whether the prosecution's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotation marks omitted) (quoting *Donnelly*, 416 U.S. at 643). In determining whether a comment rendered a trial constitutionally unfair, factors we may consider are whether the comment misstated the evidence, whether the judge admonished the jury to disre-

gard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence. *See Darden*, 477 U.S. at 182.

There were a number of instances of improper argument during the prosecution's summation, some of which were addressed by the trial court and by the California Court of Appeals.

First, the prosecution vouched for McLoren's credibility. After describing McLoren as a "very powerful and credible witness," DDA Semow told the jury on opening summation:

> [H]e was painfully honest. He answered every question truthfully, no matter how much it cost him in terms of pain, discomfort, embarrassment and humiliation. He is not a model teenager but the model of a perfect witness.

DDA Latin continued on surrebuttal:

> Think about the way you felt while you [sic] he testified. Didn't you know in your heart he was telling the truth? Didn't you? . . . Think about how honest he was about some very, very painful things in his life, some things that were embarrassing, some things that hold himself out to the public as not a very good person. He was so honest about it. That's the kind of integrity that our system would like to see.

Next, Latin impugned the character of petitioners' defense counsel. After claiming that he did not "appreciate cheap lawyer tricks," Latin argued:

> [O]ne side presented a very clear and pure picture of what happened, and the other side did some very

dirty things, dishonest. The defense in this case was dishonest.

Latin also argued that defense counsel pressured a defense witness, Jason Stout, to change his testimony so that it was more favorable to petitioners.

Finally, the prosecution made improper comments about petitioners themselves. For instance, the prosecution compared them to "a pack of wolves" when they stole Moulder's wallet, called Micah "a little punk" and addressed Hein directly, saying: "What a tough guy[ ] you are."

The trial judge sustained objections to, among other things, the prosecution's accusations of dishonesty and allegations of pressuring Stout. The judge also characterized Latin's accusation of dishonesty as "very close . . . to misconduct" and instructed the jury that there was no evidence that any of the lawyers in the case committed any wrongdoing. (Defense counsel did not object to a few of the statements petitioners now challenge, including Semow's vouching for McLoren and Latin's calling Micah "a little punk.") Several times during summation the judge made generalized instructions that argument was not evidence.

**[10]** The statement we find most problematic was not addressed by the state courts. On surrebuttal summation, Latin told the jury:

> [McLoren] wasn't like Jason Holland that told the truth that he wanted to tell, that he chose to tell. He understood that if you are going to be believed you better be prepared to come in here and open up your life no matter whether the questions seem relevant to what happened or not. And many of these questions probably didn't seem relevant. They looked like they had nothing to do with anything, but he answered them. And he opened himself up to embarrassment,

> scorn, ridicule, contempt and criminal liability, but he did it because he understood that that is what it takes to tell the truth and be believed.

This comment could have been taken to mean that McLoren exposed himself to prosecution for marijuana dealing by testifying, which, due to use immunity, would not have been true. However, the comment could also have been taken to mean that McLoren's testimony exposed him to charges of perjury if he lied on the stand. On appeal, the State concedes that the statement was incorrect. But it is hard to accept that the trial judge, who had made a number of conscientious evidentiary rulings and timely admonitions throughout summation, remained idle while the prosecution presumably deceived the jury, even though the other rulings had been prompted by defense counsel. It is probable that the judge found the statement ambiguous as well.

### d.  Prejudice Resulting from the *Brady* Violation and Prosecutorial Misconduct

Accepting that the prosecutors' comments in summation were improper and that they failed to disclose the July 10 letter to Jason and Hein, we next consider whether the prosecution's conduct prejudiced petitioners. Because we are satisfied that the trial was fundamentally fair and there was no reasonable probability that the letter would have affected the verdict, we reject both petitioners' *Brady* and prosecutorial misconduct claims.

**[11]** It is unclear whether we should employ *Brady's* prejudice standard to evaluate the cumulative effect of the prosecutorial misconduct and the non-disclosure. Although this circuit has never explicitly used the "reasonable probability" formulation found in the *Brady* line of cases to analyze alleged prosecutorial misconduct, a number of circuits have concluded that prosecutorial misconduct lends itself to that standard. *E.g.*, *Styron v. Johnson*, 262 F.3d 438, 454 (5th Cir.

2001); *Jones v. Gibson*, 206 F.3d 946, 959 (10th Cir. 2000); *Kennedy v. Dugger*, 933 F.2d 905, 914 (11th Cir. 1991); *cf. United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 n.1 (7th Cir. 1985) ("To carry this burden, [a petitioner] must show that it is at least likely that the misconduct complained of affected the outcome of his trial — i.e., caused the jury to reach a verdict of guilty when otherwise it might have reached a verdict of not guilty."); *see generally Strickler v. Greene*, 527 U.S. 263, 298-301 & n.3 (1999) (Souter, J., concurring in part and dissenting in part) (tracing the evolution of the "reasonable probability" formulation and noting the applicability of that and synonymous phrases in a number of contexts).

The standard announced in *Darden* and *Donnelly* appears to be similar to the *Brady* standard. Like the *Brady* standard, the touchstone for the *Darden*/*Donnelly* standard is the fairness of the trial. *See Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the [undisclosed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *Darden*, 477 U.S. at 181-82 & n.13 (noting that prosecutorial comments, although deserving of condemnation, did not violate due process because they did not affect the fairness of the trial). The *Darden* factors — i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment — require courts to place improper argument in the context of the entire trial to evaluate whether its damaging effect was mitigated or aggravated. In essence, what *Darden* requires reviewing courts to consider appears to be equivalent to evaluating whether there was a "reasonable probability" of a different result. *Cf. Brooks v. Kemp*, 762 F.2d 1383, 1401 (11th Cir. 1985) (*en banc*),

*vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987) (*per curiam*) (noting that "fundamental fairness, the same standard adopted in *Donnelly*, is the governing principle in reviewing errors of counsel [under the reasonable probability standard employed by *Strickland v. Washington*, 466 U.S. 668 (1984)]").

**[12]** Although it seems doubtful that *Darden* would impose a lower burden on petitioners than *Brady* does, we do not need to resolve the question here.[12] Instead we use the framework announced in *Jackson v. Brown*, 513 F.3d 1057

[12]The magistrate judge below and the State on appeal addressed the possibility of Latin's "criminal liability" statement forming the basis of a false evidence claim. The materiality standard for false evidence is less burdensome on petitioners than that for *Brady*. *See United States v. Agurs*, 427 U.S. 97, 103-04 (1976); *Benn v. Lambert*, 283 F.3d 1058 n.12 (9th Cir. 2002) (recognizing that the Supreme Court employs a stricter standard of materiality for *Brady* claims than for false testimony claims). According to the Supreme Court, this is because false evidence claims "involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 103-04. Since part of the reason false evidence claims are less burdensome is the involvement of prosecutorial misconduct, one could argue that *Darden* misconduct claims should themselves also be subject to that standard. *Cf. Brooks*, 762 F.2d at 1402 n.26 ("[T]here may be cases where the prosecutor's intentional conduct rises to a level equivalent to a knowing use of false evidence."). But that is unlikely in this case for a number of reasons. Argument in summation is hardly equivalent to evidence in its impact on a jury. *See Donnelly*, 416 U.S. at 646-47 ("The consistent and repeated misrepresentation of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions." (internal quotation marks omitted)). Summation consists of opinion, advocacy and appeals to justice. Juries are routinely instructed to view summation in that light, and we have no reason to presume that the jury in this case, having been so instructed, viewed it otherwise. In sum, the improper argument in this case did not present the same threat to the truth-seeking function of the trial process as false evidence would have. It is, thus, inappropriate to treat it as submission of false evidence.

(9th Cir. 2008), which was created for analyzing combined *Brady* and *Napue* challenges. In *Jackson*, we reasoned that, although instances of non-disclosure and false evidence must be evaluated collectively, the difference between the materiality standards used for weighing their potential prejudice compelled us to consider the materiality of the false evidence alone before combining it with non-disclosure. *Jackson*, 513 F.3d at 1076. Thus, under *Jackson's* framework, instances of false evidence are analyzed first under *Napue's* materiality standard, and, if those errors are not material standing alone, false evidence is then considered together with non-disclosure, and both are analyzed under *Brady's* more demanding standard. *Id.* Assuming, arguendo, that *Darden's* standard is less demanding than *Brady's*, we first analyze the prosecutorial misconduct challenges to assess whether they alone so infected the trial with unfairness as to make the resulting conviction a denial of due process. If the prosecution's comments alone do not meet this standard, we analyze them together with the non-disclosure of the July 10 letter to determine whether there is a reasonable probability that without those violations the result of the proceeding would have been different. In doing so, we concentrate on the touchstone of *Brady's* materiality standard: that, even with the trial errors, petitioners received "a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

**[13]** Here, two key factors illustrate that the prosecution's summation, when viewed in the context of the entire record, did not render the trial fundamentally unfair. *See Darden*, 477 U.S. at 182-83. First, in context, much of the potential prejudice of the prosecution's comments was mitigated. The trial court sustained a number of objections and gave timely cautionary instructions to the jury, including general instructions about the hortative nature of summation. Moreover, the comments were made in the course of several days of summation after a two-month trial. Regarding Latin's statement about McLoren's "criminal liability," which appeared in one paragraph of a summation that took up eighty-four pages of the

transcript, the comment was ambiguous and, to the extent it was given its more damaging interpretation, it is likely that the comment did not have much impact. McLoren had told the jury that he was not the State's priority, from which it could conclude that he faced little risk of criminal charges. Moreover, Latin's statement was ambiguous, and we do not presume that the jury ascribed to it its most damaging meaning. *See Donnelly*, 416 U.S. at 647 ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). Even if the jury gave the statement its more damaging interpretation, the statement would have bolstered McLoren's testimony only a negligible amount, which would not have helped the prosecution's case much anyway since McLoren had little incentive to lie.[13] Finally, the comment did not pervade the proceedings and was not emphasized.

[14] Second, in light of the other evidence received over the course of two months of trial, the prosecution offered the only believable theory for why the fight began in the first place, i.e., that it had been instigated by Micah's attempted robbery of McLoren's drugs. Petitioners never offered a plausible alternative to this theory. Additionally, the prosecution's version of events was corroborated by petitioners' theft of Moulder's wallet to show why the group also intended to rob McLoren. In contrast, petitioners' argument here is what defense counsel argued in summation at trial, to wit, that petitioners had entered McLoren's grandparents' property to buy marijuana and that a fight had spontaneously erupted with no words exchanged between petitioners and McLoren. Although

---

[13]Even if one could somehow argue that the statement was an instance of false evidence — and, thus, that the less-demanding *Napue* standard applied — the statement would still not be prejudicial. For the same reasons cited above, there is no reasonable likelihood that the statement could have affected the judgment of the jury.

the prosecution's case relied on McLoren's testimony, petitioners' inability to advance any plausible theory for why the fight began cannot be disregarded. Accordingly, petitioners do not demonstrate that the prosecutors' improper comments affected the fairness of petitioners' trial. *See Darden*, 477 U.S. at 181 n.13.

We next consider whether the combined instances of non-disclosure and improper argument deprived petitioners of a fair trial, meaning "a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. As explained above, the fact that the prosecution advanced the only plausible theory for the instigation of the fight undercuts any claim of prejudice.

The non-disclosure of the July 10 letter does not affect this conclusion. The use immunity letter was not the potent impeachment evidence petitioners make it out to be. McLoren received no benefit — such as dropped charges or transactional immunity — from the prosecution for testifying. The grant of use immunity left McLoren in the same position he was in before speaking with Semow. Petitioners attempt to assign more importance to the letter by suggesting that there was an unspoken (or unwritten) understanding that McLoren would not be prosecuted, but there is no support in the record for this assertion.[14]

---

[14]Petitioners, pointing to the *in camera*, *ex parte* hearing at which Semow recollected his July 10, 1995, meeting with Sorkin, claim that Sorkin was seeking transactional immunity for McLoren. At the hearing, Semow said that "one of the reasons for this interview was to see if Mr. McLoren would testify without transactional immunity." The July 10 letter indicates that Semow achieved this goal. Thus, this statement provides no support for petitioners' contention that McLoren received transactional immunity. Even if there were such an understanding, McLoren admitted at trial that Detectives Tauson and Neumann had already told him that he was not the priority and was not likely to be charged. These representations reflected an undramatic revelation: that the State was much more interested in building a murder prosecution against petitioners than against McLoren for marijuana dealing. McLoren testified to that understanding to the jury.

Another reason use immunity had only very limited impeachment value relates specifically to the substance of McLoren's testimony. As we stressed in our discussion of petitioners' false evidence claim, McLoren never denied receiving use immunity. Importantly, he was never asked whether his statements to the prosecution and at trial could have been used against him. Moreover, because McLoren was given only use immunity, his statements that he could still have been prosecuted were also not false. Even if defense counsel had confronted McLoren with the prosecution's grant of use immunity, none of McLoren's testimony would have been exposed as untruthful. Accordingly, the combined effect of the prosecution's arguments and the non-disclosure of the July 10 letter did not deprive petitioners of a fair trial.

## (2)

## Cumulative Error

Petitioners' next claim is that "the cumulative effect of multiple errors" prejudiced them. *Jackson*, 513 F.3d at 1085 (internal quotation marks omitted) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)). As with petitioners' prosecutorial misconduct claims, we consider whether the cumulative error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

**[15]** For many of the reasons set forth in our preceding discussion of prejudice, the alleged errors, when considered together, do not render the trial constitutionally flawed. The trial was long and hard-fought. The closing arguments were contentious, but the trial court sustained reasonable objections and admonished the prosecution on more than one occasion. The court advised the jury that the prosecution's questions regarding Jason's alleged gang membership and its statements impugning petitioners and their counsel were not evidence. The court also gave general instructions that arguments made

in summation were not evidence, thereby reducing the potential harm done by the prosecution's vouching for McLoren. Additionally, the prosecution's "criminal liability" statement was ambiguous and, in any event, occupied only a brief moment in summation at the end of a long trial and had little risk of rendering the entire trial unfair.

**[16]** Similarly, the undisclosed evidence was not material. McLoren testified both that he understood that he was not the priority and that he was told by the police that the State had no interest in prosecuting him. Moreover, if one were to accept petitioners' argument that they were on the property merely to buy drugs, then, as noted, the reason for the fight makes little sense. Therefore, any trial errors, to the extent they existed, did not prejudice petitioners.

**(3)**

**Ineffective Assistance of Counsel**

Finally, Miliotti contends that he received ineffective assistance of counsel when his trial counsel, Leftwich, who had a copy of the use immunity letter at the time of trial, failed to cross-examine McLoren with it.[15] We reject Miliotti's claim.

Claims of ineffective assistance of counsel are governed by *Strickland*, which requires a petitioner to demonstrate: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687. As Miliotti must satisfy both prongs in order to prevail under *Strickland*, we may dispose of his claim if he fails to satisfy either prong of the two-part test. *Id.* at 697.

---

[15]Miliotti also faults Leftwich for failing to impeach McLoren on his statement to the police that petitioners had tried to steal his electronics, failing to impeach him on his arrest for marijuana use in August 1995, failing to introduce evidence of previous burglaries of the fort and failing to introduce a lack of any fingerprint evidence.

**[17]** Turning first to the "performance prong," Miliotti "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Courts must be "highly deferential" to counsel's performance such that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

**[18]** Miliotti cannot rebut the presumption that Leftwich's failure to confront McLoren with the July 10 letter was sound trial strategy. As explained earlier, there was little, if anything, to be gained by questioning McLoren about having been granted use testimony. Rather than pursuing a fruitless attempt to impeach McLoren with the use immunity letter, Leftwich instead focused on the inconsistencies in McLoren's description of Millioti's actions. McLoren admitted that he did not recall whether Miliotti was involved in the fight and testified inconsistently about whether Miliotti had even entered the fort, where the entirety of the fight took place. It also emerged during trial that McLoren had initially named Velardo — who never entered the property — as the fourth attacker when he was questioned by the police, a fact that Leftwich focused on in summation. Leftwich's strategy bore fruit when the California Court of Appeals concluded that Miliotti was not a major participant in the attempted robbery and reduced his conviction to second degree murder, finding that "the evidence is persuasive that Miliotti did not enter the fort, but merely stood in the doorway during the activities inside the fort." *Hein*, 104 Cal. Rptr. 2d at 92, 95. Leftwich's performance was, thus, not deficient for failing to raise the use immunity letter.

Even if Miliotti satisfied the first prong, he must still establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This is the same standard used to determine the materiality of suppressed evidence under *Brady. See Bagley*,

473 U.S. at 682; *Benn*, 283 F.3d at 1053 ("[W]e analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases."). Because petitioners' case was weak and McLoren admitted that he was probably not going to be prosecuted and never denied having received immunity, Miliotti was not prejudiced by counsel's failure to impeach McLoren with the use immunity letter. Miliotti's other allegations of ineffective assistance of counsel are without merit.

## CONCLUSION

Under our independent review of the record, we determine that petitioners' state convictions did not violate the Constitution or laws of the United States. It was therefore not objectively unreasonable for the California Supreme Court to deny petitioners' state habeas petitions. We affirm the district court's denial of habeas relief.

AFFIRMED.