**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Blair William GUTHRIE,
Defendant–Appellant.**

**Nos. 89–10340, 90–16036.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1991.

Decided April 25, 1991.

Scott A. Sugarman and Robert J. Beles, Sugarman & Cannon, Oakland, Cal., for defendant-appellant.

Sandra L. Teters, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before FLETCHER, NORRIS and TROTT, Circuit Judges.

## OPINION

TROTT, Circuit Judge:

Blair William Guthrie appeals his conviction for possession of an unregistered si-

lencer, claiming the district court erred by: (1) failing sua sponte to give certain jury instructions; (2) restricting the cross-examination of a key government witness; (3) refusing to hold a *Franks* hearing; and (4) increasing his criminal history score under the United States Sentencing Guidelines based on a vacated state conviction. We have jurisdiction under 28 U.S.C. § 1291 (1988) and 18 U.S.C. § 3742 (1988), and we affirm the conviction and remand for resentencing.

### FACTS AND PROCEEDINGS BELOW

Guthrie was charged in a fourteen count indictment with committing various narcotics and firearms offenses. The jury acquitted him of all counts but Count 10, which charged he had possessed an unregistered silencer. *See* 26 U.S.C. § 5861(d) (1988). The district court sentenced Guthrie under the Sentencing Guidelines.

This appeal arises from the following facts.

Based on information from Guthrie's former wife, Linda, the police suspected he was operating a drug lab at a warehouse in Pittsburg, California. After corroborating some of the details of Linda's story, the police filed an affidavit with a magistrate, who issued a warrant to search the warehouse. It was later discovered that a police officer had instructed Linda to lie to the agent writing the affidavit; the officer had her tell the agent that she had visited the warehouse two months before, when in fact she had not been there in four and one half years. This lie was incorporated into the affidavit by the agent, who was unaware of its falsity.

The raid on the warehouse yielded information that provided probable cause for the issuance of a warrant to search Guthrie's home and a storage locker located in Oakland, California. The search of a workshop in Guthrie's home resulted in the seizure of pieces of metal and rubber, and tools associated with the making of silencers. The search of the storage locker uncovered a cache of drugs, firearms, commercially manufactured silencers, and homemade silencers.

At trial, government experts tied the scraps and tools found in Guthrie's workshop to the homemade silencers discovered in the storage locker. Linda testified that the contents of the locker belonged to Guthrie. The defense cross-examined Linda for two days, eliciting an array of facts diminishing her credibility. However, the district court did not allow the defense to cross-examine Linda about a murder she allegedly had committed.

At sentencing, Guthrie challenged the constitutional validity of a 1973 California narcotics conviction used to increase his criminal history score under the Guidelines. The court held a hearing, determined the conviction was constitutional, and added three points to Guthrie's criminal history score. Guthrie then filed a direct appeal.

Shortly after filing the appeal, Guthrie convinced the California Superior Court to vacate his 1973 conviction. Guthrie then petitioned the district court pursuant to 28 U.S.C. § 2255 (1988), asking to be resentenced based on the state court's vacation of the prior conviction. The district court held it was not bound by the state court's decision and denied the petition. Guthrie appealed the court's denial of his section 2255 petition, and his two appeals have been consolidated.

### ANALYSIS

### I

#### The Jury Instruction Claims

Guthrie was charged with possessing thirteen unregistered silencers recovered by police from a storage locker. At trial, an expert witness for the government testified that some of these silencers were homemade, and that various metal and rubber scraps and tools seized from Guthrie's workshop indicated he had manufactured them. The government never suggested to the jury that these scraps in themselves could count as silencers, and both sides agree on appeal that they could not so

qualify.[1] Nevertheless, Guthrie advances several elaborate theories designed to show the jury convicted him of the silencer offense based solely on the scrap evidence. The likelihood of this happening could have been reduced, he argues, if the court had instructed the jury that the scrap evidence was legally insufficient to qualify as a silencer.

Guthrie did not ask for this instruction, so the court's failure sua sponte to give it is reviewed for plain error. *United States v. Chambers*, 918 F.2d 1455, 1458 (9th Cir. 1990). " 'A plain error is a highly prejudicial error affecting substantial rights.' " *Id.* (quoting *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979)).

■ On review of the record, we believe it is unlikely the jury convicted Guthrie because of a mistaken impression that the scraps could constitute a silencer. On the contrary, it is probable that the jury merely considered the scraps as evidence linking him to the completed homemade silencers seized from the storage locker. Guthrie has not demonstrated plain error.

Guthrie also contends the court erroneously denied his proposed instruction that his "mere presence" in the house where the scraps were found was insufficient to establish he possessed them. This instruction was especially important, he says, since his defense was that several other people shared the workshop with him and could have been responsible for the scraps. The court initially denied Guthrie's "mere presence" instruction. During its deliberation on the verdict, the jury sent out a note inquiring about Guthrie's responsibility for the activities that occurred in his home. The court then offered to instruct the jury on the elements of constructive possession. Guthrie objected to this proposal, however, and requested instead that the court reread its earlier instruction that the jury had to

find he knowingly possessed the silencers. The court did so.

■ When the defendant himself proposes the jury instruction he later attacks on appeal, review is denied under the "invited error" doctrine. *United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *People of the Territory of Guam v. Alvarez*, 763 F.2d 1036, 1037 (9th Cir.1985); *United States v. Alexander*, 695 F.2d 398, 402 (9th Cir.1982), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983). Here, the district court offered to instruct the jury on what it could infer from Guthrie's use with others of his workshop, effectively granting him a "mere presence" instruction. Guthrie declined the offer, however, and proposed instead that the court simply reread its more general instruction on the element of knowledge. The court complied with Guthrie's request, so he cannot now complain of what he received.

## II

### *The Limitation on the Cross–Examination*

Linda Guthrie was the government's chief witness. The defense cross-examined her for two days and thoroughly impeached her credibility. At one point toward the end of the cross-examination, the defense asked Linda if she knew a man named Terry Wiseman or a man called "Hippy Bob." She responded that she knew Hippy Bob, but not Wiseman. The defense then inquired: "Isn't it true that, in 1978, that you and Sergay [Linda's former partner], by use of weaponry, killed both of those individuals?" The government objected to this question and the district court held a side-bar conference, after which it decided the defense would not be allowed to explore the issue of the alleged murder. The court stated that it had given counsel great leeway to cross-examine Linda, and that

1. *See United States v. Endicott*, 803 F.2d 506, 508–09 (9th Cir.1986) (unassembled silencer may constitute an illegal firearm only if jury finds beyond reasonable doubt that all of its component parts are readily available and only a brief and a minimal effort is required to assemble the complete design by reason of the nature and location of the parts).

further inquiry into her criminal background was unnecessary.

■ Guthrie claims this restriction of the cross-examination violated the Sixth Amendment. *See e.g., Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We review the district court's limitation on the extent of the cross-examination for an abuse of discretion. *United States v. Feldman,* 788 F.2d 544, 554 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). "The trial court does not abuse its discretion as long as the jury receives sufficient information to appraise the biases and motivations of the witness." *Id.; accord United States v. Lopez,* 885 F.2d 1428, 1438 (9th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990); *United States v. Jenkins,* 884 F.2d 433, 436 (9th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 568, 107 L.Ed.2d 562 (1989); *United States v. Kennedy,* 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984).

■ Guthrie correctly claims that, the more serious the informant's alleged crime, the greater the informant's incentive is to testify favorably to the government in exchange for a grant of immunity from prosecution. It is conceivable, for example, that an informant confronting a potential murder indictment would testify falsely to secure dismissal of the charge. In that situation, testimony concerning the informant's alleged crime would have great impeachment value.

In the present case, however, Linda did not receive immunity from prosecution (known as "transactional immunity") for *any* of her prior crimes. She only was granted "use immunity." This form of immunity allowed Linda to testify about her criminal past without the government later being able to use her *testimony* against her. *See, e.g., United States v. Lipkis,* 770 F.2d 1447, 1450 (9th Cir.1985) (explaining the difference between transactional and use immunity). In other words, the authorities were perfectly entitled to investigate her crimes independently and prosecute her based on evidence not derived from that testimony. Thus, the deal Linda struck with the prosecution was not as "sweet" as it might first appear, and her incentive to lie therefore was not as great as Guthrie implies. *Cf. United States v. Pflaumer,* 774 F.2d 1224, 1230 (3d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986) (commenting on the reduced impeachment value of grants of use immunity).[2]

While we recognize Linda's alleged involvement with a murder had some impeachment value, the defense adequately impeached her credibility by other lines of questioning. For instance, on cross-examination she admitted that: (1) she had manufactured and distributed illegal drugs on a large-scale basis; (2) she had undergone psychotherapy and treatment for drug and alcohol abuse; (3) she associated with Hells Angels members and convicted drug dealers; (4) she had been convicted of possessing an illegal machine gun; and (5) she had planned to use the machine gun to help a friend escape from prison. The defense also explored allegations that: (1) she was concerned Guthrie would attempt to take custody of their son if he was not imprisoned; (2) her memory was impaired due to excessive drug use; (3) she collected Nazi literature and nicknamed herself "Linda of the SS;" and (4) she once abandoned her children at a shopping mall.

We believe the defense's development of these themes adequately apprised the jury of Linda's questionable credibility and her

2. Guthrie claims the trial record reveals Linda believed she could not be prosecuted for any of her prior crimes. Given her subjective belief, he contends, the deal struck with the government was the functional equivalent of a grant of transactional immunity, and thus the alleged murder was an important piece of evidence indicating her motive to lie. It is true there is support in the record for the theory that Linda testified under such a mistaken belief. We need not explore this issue, however, because even if Linda believed she would be immune from prosecution in exchange for her testimony, the defense developed other facts that sufficiently apprised the jury of her motivation to lie and her lack of credibility in general.

motivation to lie. After two days of extensive cross-examination, her earlier testimony on direct was thoroughly tarnished. The most telling indication the jury disbelieved Linda is that it acquitted Guthrie of the other crimes she testified he committed. We therefore hold the district court did not abuse its discretion in limiting the cross-examination.

### III

#### *The Denial of the Franks Hearing*

■ The homemade silencers and the materials used to make them were seized pursuant to a search warrant. The government concedes that the information used to obtain this warrant came solely from its earlier search of the warehouse, and that without this information there would have been no probable cause supporting the warrant. If the search of the warehouse was illegal, the later search of Guthrie's home and storage locker also was illegal because "evidence which is obtained as a direct result of an illegal search and seizure may not be used to establish probable cause for a subsequent search." *United States v. Wanless*, 882 F.2d 1459, 1465 (9th Cir. 1989).

Guthrie claims the search of the warehouse was illegal because, under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the affidavit in support of the search warrant contained a false statement, which, if redacted, deprived the warrant of sufficient information to establish probable cause. The district court decided Guthrie had no standing to challenge the search of the warehouse and that, in any event, the affidavit had provided probable cause even if the false statement was removed. We agree Guthrie lacked standing to challenge the search.

The district court found as follows:

[Guthrie] does not now claim, indeed has never claimed, any interest whatsoever in the laboratory. From the witness stand he steadfastly denied any involvement in whatever illicit activities may have taken place at 564b West 10th Street [the address of the warehouse]. He argued that the drug lab, if it existed, belonged to the former husband of his wife, a convicted methamphetamine manufacturer. When his wife testified that it was indeed [Guthrie's] at the time of his arrest, she was discredited as a vindictive and untruthful drug addict. A neighbor, who placed [Guthrie] at the scene, was tarred with the same brush. The only other evidence the government offered was inconclusive sightings of [Guthrie's] car in the vicinity of the lab. [Guthrie] can have no expectation of privacy in the lab and may not be heard on the legality of its search.

Guthrie offers no serious challenge to the above findings. Accordingly, he has failed to meet his burden of establishing a reasonable expectation of privacy in the warehouse. *See Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978).

■ Guthrie's assertion that the government may not contest his standing because it has adopted contradictory positions with regard to his interest in the warehouse is unavailing. The Supreme Court has recognized that

[t]he government ... may lose its right to raise [a defendant's lack of a reasonable expectation of privacy] ... when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.

*Steagald v. United States*, 451 U.S. 204, 209, 101 S.Ct. 1642, 1646, 68 L.Ed.2d 38 (1981). Guthrie's case, however, is distinguishable in two respects from cases where such a waiver has been found. First, the government did raise the standing issue in a timely fashion when Guthrie moved to suppress the evidence after trial. Second, while the government argued at trial that Guthrie controlled the warehouse, it did not do so successfully; the jury acquitted Guthrie of all charges pertaining to the warehouse. *Compare Steagald*, 451 U.S. at 208–11, 101 S.Ct. at 1646–47; *United States v. Bagley*, 772 F.2d 482, 489 (9th Cir.1985); *United States v. Morales*, 737

F.2d 761, 763 (8th Cir.1984) (government precluded from challenging standing where it successfully argued at trial that defendant had dominion and control over premises searched). We hold Guthrie lacked standing to contest the search of the warehouse.

## IV

### The Sentencing Guidelines Claim

Based on Guthrie's 1973 California narcotics conviction, the district court added three points to his criminal history score. *See* U.S.S.G. § 4A1.1(a). This addition of points raised him from Category III to Category IV, thus increasing his sentence. *See* U.S.S.G. Ch. 5, Pt. A. Guthrie argues his 1973 conviction should not have contributed to his criminal history score because it was obtained in violation of the Sixth Amendment. Specifically, he contends a conflict of interest arose when his attorney represented him and two codefendants, and that this conflict rendered his attorney's assistance ineffective.

The Sentencing Guidelines limit the consideration of constitutionally invalid prior convictions.[3] At the time Guthrie was sentenced, section 4A1.2, Application Note 6, stated:

*Invalid Convictions.*

Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Any other sentence resulting in a valid conviction is to be counted in the criminal history score. Convictions which the defendant shows to have been constitutionally invalid may not be counted in the criminal history score. Also, if to count an uncounseled misdemeanor conviction would result in the imposition of a sentence of imprisonment under circumstances that would violate the United States Constitution, then such conviction shall not be counted in the criminal history score. Nonetheless, any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 if it provides reliable evidence of past criminal activity.

U.S.S.G. § 4A1.2, Application Note 6.[4] Under Note 6, therefore, district courts could not increase a defendant's criminal history score based on a prior conviction shown to be constitutionally invalid. *See, e.g., United States v. Newman*, 912 F.2d 1119, 1121 (9th Cir.1990); *United States v. Edwards*, 911 F.2d 1031, 1035 (5th Cir.1990); *United States v. Wildes*, 910 F.2d 1484, 1485 (7th Cir.1990); *United States v. Jones*, 907 F.2d 456, 461 (4th Cir.), *cert. denied,* — U.S.

---

3. The Constitution places similar limitations on the use for sentencing purposes of prior invalid convictions. *See United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *accord United States v. Bagley*, 837 F.2d 371, 376 (9th Cir.), *cert. denied,* 488 U.S. 924, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988); *United States v. Williams*, 782 F.2d 1462, 1466 (9th Cir.1985); *Brown v. United States*, 610 F.2d 672, 674–75 (9th Cir.1980); *Farrow v. United States*, 580 F.2d 1339, 1344–45 (9th Cir.1978) (en banc). Although Guthrie stakes his claim on both the Guidelines and the Constitution, we see no reason to reach his constitutional theory since, at least in this case, the demands of the Guidelines and the Constitution appear to be the same.

4. Application Note 6 now provides:

*Reversed, Vacated, or Invalidated Convictions.* Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted. Also, sentences result-

ing from convictions that a defendant shows to have been *previously ruled constitutionally invalid* are not to be counted. Nonetheless, the criminal conduct underlying any conviction that is not counted in the criminal history score may be considered pursuant to § 4A1.3 (Adequacy of Criminal History Category).

U.S.S.G. § 4A1.2, Application Note 6 (emphasis supplied). The "previously ruled" language implies that defendants no longer may challenge prior convictions at the sentencing stage. However, a "background" note following the commentary to section 4A1.2 states that "[t]he Commission leaves for *court determination* the issue of whether a defendant may collaterally attack at sentencing a prior conviction." U.S.S.G. § 4A1.2, Background Note (emphasis supplied); *see also United States v. Arigbodi*, 924 F.2d 462 (2d Cir.1991) (commenting on the change). Because Guthrie was sentenced under old Note 6, this change in wording, whatever its significance, is immaterial to this case. *See United States v. Mims*, 928 F.2d 310, 312 n. 1 (9th Cir.1991).

——, 111 S.Ct. 683, 112 L.Ed.2d 675 (1990); *United States v. Dickens,* 879 F.2d 410, 411–12 (8th Cir.1989).[5] If the district court proposed to increase the defendant's criminal history score based on a prior conviction, the defendant was entitled to challenge the validity of that conviction.[6]

On June 30, 1989, the district court held a hearing to determine whether Guthrie's representation in 1973 had been ineffective due to the alleged conflict of interest. The district court rejected Guthrie's claim, finding it wholly theoretical.

On August 8, 1989, following his federal sentencing hearing, Guthrie filed a petition in California Superior Court to vacate his 1973 conviction. In this petition, Guthrie reasserted his Sixth Amendment claim, citing federal case law. He also relied on California law, which he said established a "more rigorous standard of review" for conflict of interest claims.

The District Attorney did not contest Guthrie's petition. Therefore, on October 23, 1989, the Superior Court vacated Guthrie's 1973 conviction, reinstated his "not guilty" plea, and confirmed that the District Attorney had dismissed the information against him. The court did not state the legal basis for granting Guthrie's petition. Its decision was not appealed and is now final under California law.

Guthrie returned to federal district court on collateral review, arguing the court was bound to respect the state court's judgment vacating his 1973 conviction, and that he should be resentenced without the three criminal history points earlier assessed against him.

The district court denied Guthrie's motion on July 13, 1990, finding that its previous decision took precedence over the later state court judgment. The court opined that, if Guthrie had obtained the state court judgment *before* his sentencing hearing, it would have been bound by that judgment. The court reasoned, however, that Full Faith and Credit is a "two-way street," and that the state court should have respected its earlier decision affirming the validity of Guthrie's 1973 conviction. The court therefore refused to subtract the three criminal history points.

■■■ We conclude doctrines such as Full Faith and Credit, collateral estoppel and res judicata, and related jurisdictional principles based on comity concerns, are inapplicable in this context, where the issue is the role of prior state convictions in a federal sentencing scheme. As we explain, however, the district court was bound by the Sentencing Guidelines to respect the state court's judgment vacating Guthrie's conviction.

*United States v. Jones,* 907 F.2d 456 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 683 (1990), informs our inquiry. In *Jones,* the defendant challenged at his federal sentencing hearing the validity of a prior state conviction used to increase his criminal history score. The district court decided it could not entertain such a challenge, reasoning the defendant first had to raise his claim in a state post-conviction proceeding and exhaust his state remedies, as required by the federal habeas corpus laws. *Id.* at 461. On appeal, the dissent in *Jones* agreed, arguing federal courts are without power to "invalidate" state convictions before the state courts have spoken. *Id.* at 470–80. The dissent also based its conclusion on the Full Faith and Credit Statute. *Id.* at 482–83.

The majority in *Jones* held the district court had jurisdiction to determine the validity of the prior state conviction *for federal sentencing purposes. Id.* at 462. It reasoned that the district court's task was

---

**5.** We note that the Guidelines permit district courts to depart upward pursuant to section 4A1.3 based on the conduct underlying an invalid conviction. U.S.S.G. §§ 4A1.2, Application Note 6, 4A1.3; *United States v. Cota-Guerrero,* 907 F.2d 87, 90 (9th Cir.1990) (facts surrounding reversed conviction may be considered for departure purposes though conviction itself may not influence criminal history score).

**6.** It may be that defendants no longer have an automatic right under the Guidelines to attack the validity of their prior convictions at the sentencing hearing. *See* Note 4, *supra.* The Constitution may afford such a right, however. *See* Note 3, *supra.*

limited to deciding the effect the conviction should be given in the context of a federal statutory scheme, and that its decision would therefore not impinge on the state courts' jurisdiction. *Id.* The majority explained:

> In federal sentencing hearings ... the exercise of federal judicial power as exemplified in its party structure is of an altogether different character. Involving only the United States and a federal defendant, it is limited to the federal court's meting out an appropriate sentence for violation of a *federal* crime. To consider prior state convictions in making that determination involves no assertion of federal jurisdiction over a state criminal case, as occurs in a habeas corpus proceeding. The exercise of the federal judicial power to sentence in federal criminal cases raises questions not of federal jurisdiction but only of the proper exercise of the sentencing court's discretion and the permissible breadth of the sentencing court's inquiry.

*Id.* (emphasis in original) (footnote omitted). *See also United States v. Mims,* 928 F.2d 310, 312 (9th Cir.1991) (endorsing the *Jones* approach). Following the general lesson of *Jones,* we conclude the question whether the district court "owed deference" to the state court's judgment, or vice versa, is misplaced. We must decide instead what the Sentencing Guidelines demand.

In this endeavor, we focus our attention on section 4A1.2, Application Note 6 of the Guidelines. As observed earlier, the text of Application Note 6 has undergone several changes. The first sentence of the note, however, has remained the same: "Sentences resulting from convictions that have been reversed or vacated because of errors of law, or because of subsequently-discovered evidence exonerating the defendant, are not to be counted." U.S.S.G. § 4A1.2, Application Note 6.

■ We read this passage to mean what it says: When a state court vacates a defendant's prior state conviction, the sentence resulting from that conviction may not influence the defendant's criminal history score under the Guidelines.[7] The state court has plenary authority to vacate state convictions. Once the court vacates a conviction, that conviction expires in the eyes the State. It would therefore be odd, and we believe contrary to the Guidelines, for a federal court to treat as valid a state conviction that no longer exists, even though the conviction is being considered for the limited purposes of federal sentencing. As in the present case, the district court may believe the state court's decision overturning the prior conviction is incorrect, but that is beside the point, for the Guidelines are concerned only with the state court's final determination, not with the soundness of its reasoning. More importantly, second-guessing the state court may prove problematic, especially in cases where, as here, the state court's decision does not specify whether it is grounded on federal law or on a more expansive state right.

■ Technically, Application Note 6 refers to convictions that *"have been* reversed or vacated," arguably implying that, for a state conviction to be considered invalid under the Guidelines, the state court must have rendered its decision by the time of federal sentencing. Such an interpretation, however, would lead to the anomalous result that federal defendants whose convictions were invalidated after this deadline would be unable to challenge their federal sentences under 28 U.S.C. § 2255 (1988) based on the later state court decision. This would offend common sense, because a state conviction is just as vacated when pronounced so by the state court *after* federal sentencing. It would also place an often unrealistic burden on defense attorneys to obtain a state court judgment in advance of sentencing, when the state court's docket load might not permit rapid resolution of the defendant's petition. We do not believe the drafters of the Guidelines intended such an outcome. More like-

---

7. Notice, however, that the Guidelines state that convictions set aside "for reasons unrelated to innocence or errors of law" are to be counted. U.S.S.G. § 4A1.2, Application Note 10.

ly, they did not anticipate a case such as the one presented here.

Finally, we note that our holding will have a minimal effect on the workload of the district courts. When a defendant files a section 2255 petition based on a state court decision vacating his prior state conviction, the district court will simply have to verify the authenticity of the judgment and adjust the defendant's sentence downward accordingly. Indeed, this procedure likely will consume less time than a examination of the state court decision on the merits.

■ The district courts are still free under Application Note 6 to decide whether the conduct underlying the vacated conviction warrants an *upward departure* pursuant to section 4A1.3 because it provides "reliable information" regarding the defendant's criminal past. *See* U.S.S.G. §§ 4A1.-2, Application Note 6, 4A1.3; *United States v. Cota–Guerrero*, 907 F.2d 87, 90 (9th Cir.1990) (facts surrounding reversed conviction may be considered for departure purposes though the conviction itself may not influence the criminal history score); *accord United States v. Gaddy*, 909 F.2d 196, 200–01 (7th Cir.1990).

On remand, the district court shall subtract the three points it added to Guthrie's criminal history score based on his vacated 1973 conviction. The district court may, in its discretion, consider whether the conduct underlying the conviction, as shown by reliable evidence, justifies an enhancement.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.