NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

STATE OF ARIZONA, *Appellee,*

*v.*

ARTHUR ANDREW LEYBA, *Appellant.*

No. 1 CA-CR 13-0026
FILED 4-22-2014

———————————————

Appeal from the Superior Court in Mohave County
No. S8015CR201100415
The Honorable Steven F. Conn, Judge

**AFFIRMED**

———————————————

COUNSEL

Office of the Attorney General, Phoenix
By Jana Zinman
*Counsel for Appellee*

Mohave County Legal Advocate's Office, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Donn Kessler delivered the decision of the Court, in which Judge Patricia K. Norris and Judge Maurice Portley joined.

---

**K E S S L E R**, Presiding Judge:

**¶1**        Arthur Andrew Leyba appeals his convictions for first degree murder, first degree burglary, attempted armed robbery and misconduct involving weapons.  Leyba argues the evidence was insufficient to support his convictions and that the trial court erred when it precluded questions regarding a witness's use immunity, when it admitted evidence of Leyba's gang affiliation and when it admitted a hearsay statement as a present sense impression.  Finally, Leyba argues the prosecutor engaged in misconduct during closing argument.  We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2003), 13-4031 (2010) and 13-4033(A)(1) (2010).  For the reasons that follow, we affirm Leyba's convictions.

## DISCUSSION

### I.    Sufficiency of the Evidence

**¶2**        Leyba first argues the evidence was insufficient to support his convictions.  "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction."  *State v. Soto-Fong*, 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) (internal quotation marks and citation omitted).  "To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury."  *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987).

**¶3**        "We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant."  *State v. Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998).  We resolve any conflict in the evidence in favor of sustaining the verdict.  *State v. Guerra*, 161 Ariz. 289, 293, 778 P.2d 1185, 1189 (1989).  We do not, however, reweigh the evidence.  *Id.*

¶4        The victim was a drug dealer.  The victim purchased some of his drugs from a woman ("G") who was angry that the victim owed her money for drugs.  G had been "in [the victim's] face" about the debt.  The night of the murder, G introduced Leyba to a friend and told the friend Leyba was a "gangster" with ties to a gang.  When the friend made a joke, Leyba responded, "No, seriously," "I'm seriously a gangster."  Leyba further told the friend he was a "soldier" and a "hit man" that did "whatever" when called to do so.  He then showed the friend a gun he kept "just in case" he ever had to "handle shit," as well as a black or dark blue bandana.  Lebya told the friend to call him "Capone."  When another person entered the room, Leyba told that person he "rolls with the south siders," told that person to call him "Capone" and also showed that person his gun and bandana.  Earlier that day, G had told her friend that "something might go down."  G also told her friend and the other person present they should be afraid of Leyba and not mention him to anyone.

¶5        Leyba had distinctive tattoos indicative of his membership in the "18th Street" street gang, one of the largest, if not the largest criminal street gang in the country.  The "18th Street" gang has a presence in Bullhead City, the site of the murder.  The "18th Street" gang is involved in "taxing" individuals to collect unpaid debts, including drug debts.  This "taxing" can take place on behalf of a drug dealer who requests the gang or a gang member to assist in the recovery of a debt owed to the dealer.  Taxing can involve taking other personal property to satisfy the debt.  Taxing frequently involves violence or threats of violence and it is common for the person doing the taxing to be armed.

¶6        The victim lived in the basement of a residence owned by another person.  The murder took place in the basement in the presence of one witness, ("K").  Prior to entering the basement ahead of the victim, K saw the victim and G talking outside the residence.  When the victim eventually entered the basement, he seemed mad.  Although the record is unclear on this point, at some point either just before or just after the conversation between the victim and G, G entered the ground floor of the residence and told the owner, "don't freak out.  Capone is here."  G then told the owner she did not want to hang around and left.

¶7        Shortly thereafter, a man with a gun entered the basement as the victim and K sat inside.  The man had a shaved head and a blue bandana over his face.  The gun was black, long and had a barrel.  The man asked the victim if he had the man's money, to which the victim responded no, but he would make payments.  The man told the victim to shut up and asked, "Do you know who you're fucking with?  18th Street."

At some point, the man forced the victim to empty all his personal property from his pockets. The man then pistol-whipped the victim, "and that's when the gun went off," shooting the victim in the face. The man fled.

¶8         K attempted to contact 911 but was unsuccessful. She then went to the home of her boyfriend approximately five minutes away and told him someone shot the victim. K described the person's unique tattoos and told her boyfriend she thought it was "Capone." The boyfriend knew Leyba and knew his "street name" was "Capone." The boyfriend went to the victim's residence and found the victim still alive in the basement. He called 911 at 5:44 a.m. The victim eventually died of a gunshot wound to the cervical spine.

¶9         Law enforcement officers found an empty cartridge casing in the basement. A gun recovered from a river fired that cartridge. Divers found the gun after G told authorities where to search. K identified a photograph of the recovered gun as similar to the gun used to shoot the victim. Other witnesses identified the recovered gun as the same gun Leyba displayed when he introduced himself as a "gangster" called "Capone." K testified it was possible Leyba was the person who shot the victim. She further testified, however, she could not confidently say Leyba was not the person.

¶10         The day before the murder, Leyba took his roommate's ("Z") cell phone and told him he would keep it. When he took the phone, Leyba possessed a gun Z identified as "similar" to the gun used to shoot the victim. Calls between the cell phone Leyba took from Z and G's cell phone took place at 5:24 a.m. and 5:26 on the morning of the murder, as well as other times earlier that morning. Shortly after 7:00 on the morning of the murder, Leyba and G appeared together on security video at a nearby casino. Later that morning, when told that a person to whom Leyba owed a drug debt had asked about his money, Leyba said to tell the person Leyba "got burned" and "went and handled it" or Leyba "got burned" and "had to handle business."

¶11         The above evidence was sufficient to support Leyba's convictions. This evidence was more than sufficient to permit the jury to find beyond a reasonable doubt that Leyba committed first degree murder when he intentionally or knowingly caused the death of the victim with premeditation, *see* A.R.S. § 13-1105(A)(1) (2010) (premeditated first degree murder), and/or when he caused the death of the victim in the course of and in furtherance of committing burglary or attempted armed robbery,

*see* A.R.S. § 13-1105(A)(2) (felony murder). The evidence was also sufficient to permit the jury to find beyond a reasonable doubt that Leyba committed first degree burglary when he entered or remained unlawfully in or on a residential structure with the intent to commit any theft or felony therein, *see* A.R.S. § 13-1507 (2010), and that he did so while he knowingly possessed a deadly weapon. *See* A.R.S. § 13-1508(A) (2010) (first degree burglary).

¶12 The evidence was also sufficient to permit the jury to find beyond a reasonable doubt that Leyba committed attempted armed robbery when he attempted to take property from the victim against the victim's will through the use or threatened use of force against the victim, that he did so with the intent to coerce the victim's surrender of the property or to prevent the victim's resistance, *see* A.R.S. § 13-1902(A) (2010), and that he did so while armed with a deadly weapon. *See* A.R.S. § 13-1904(A)(1) (2010) (armed robbery); A.R.S. § 13-1001 (2010) (attempt). Finally, Leyba stipulated at trial that he was a prohibited possessor for purposes of the charge of misconduct involving weapons, *see* A.R.S. § 13-3102(A)(4) (Supp. 2013), and told the jury in closing that he was guilty of misconduct involving weapons.

¶13 Although much of the evidence was circumstantial, "[t]he probative value of evidence is not reduced because it is circumstantial." *State v. Murray*, 184 Ariz. 9, 31, 906 P.2d 542, 564 (1995). A conviction may be proven "by circumstantial evidence alone." *State v. Burton*, 144 Ariz. 248, 252, 697 P.2d 331, 335 (1985). Further, although Leyba attacks at length the credibility of numerous key witnesses, "[t]he credibility of witnesses is an issue to be resolved by the jury." *Soto-Fong*, 187 Ariz. at 200, 928 P.2d at 624 (internal quotation marks and citation omitted). "Because a jury is free to credit or discredit testimony, we cannot guess what they believed, nor can we determine what a reasonable jury should have believed." *State v. Bronson*, 204 Ariz. 321, 328, ¶ 34, 63 P.3d 1058, 1065 (App. 2003) (internal quotation marks and citation omitted). Finally, Leyba's reliance on *State v. Guiliani*, 24 Ariz. App. 530, 533 (1975), is unavailing. In *Guiliani*, this Court determined the evidence was insufficient to support a defendant's conviction for attempted transportation of narcotics because the sole eyewitness's identification of the defendant was limited to the similarity of the defendant's height and hair to the person she observed. More importantly, there was "*no other evidence* to connect [Guiliani] with the crime charged." *Id.* (emphasis added). Here, there is a variety of circumstantial evidence from numerous witnesses that is sufficient to support the jury's determination.

## II.  Preclusion of Cross-Examination Regarding Use Immunity

**¶14**      Leyba next contends the trial court erred when it precluded cross-examination of Z regarding Z's use immunity.  Leyba argues the use immunity was relevant to the determination of Z's credibility.  We review "[e]videntiary rulings that implicate the Confrontation Clause de novo." *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42, 140 P.3d 899, 912 (2006).  "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks and citation omitted).  We review the restriction of the scope of cross-examination "on a case-by-case basis to determine whether the court unduly inhibited the defendant's ability to present information bearing on issues or on the credibility of witnesses." *State v. Doody*, 187 Ariz. 363, 374, 930 P.2d 440, 451 (App. 1996).

### A.  Z's Use Immunity

**¶15**      The fourth day of trial, the State filed a motion to compel the testimony of Z because Z's attorney had informed the State that Z would assert his Fifth Amendment right against self-incrimination.  Z was concerned he would have to make admissions regarding prior felonies, unrelated but pending charges, and "other things."  The State moved the court to order the witness to testify pursuant to A.R.S. § 13-4064 (2010). Section 13-4064 allows a court to order a witness to testify and provides that the information derived directly or indirectly from that testimony "shall not be used against the person in any proceeding or prosecution for a crime or offense concerning which [the witness] gave answer or produced evidence under court order."      This is known as "use immunity." *Patchell v. State*, 147 Ariz. 508, 509, 711 P.2d 647, 648 (App. 1985).  A witness ordered to testify under such circumstances is still subject to penalties for perjury as well as contempt proceedings, including jail time, for refusing to testify, just as any other witness.  A.R.S. § 13-4064.

**¶16**      The trial court ordered Z to testify pursuant to A.R.S. § 13-4064 and noted Z would have use immunity pursuant to that section.  Z's attorney then asked the court to advise Z of the available consequences if he refused to testify and the trial court did so.

**¶17**      Leyba asked for the opportunity to cross-examine Z regarding his use immunity.  The court held the process of ordering Z to testify and the grant of use immunity was irrelevant.  The court found this

was not a situation in which the State agreed to dismiss pending charges or afford the witness any other benefit in exchange for testimony. The court further held it would not limit Leyba's cross-examination of Z or his ability to impeach Z in any other way. The court only precluded questions regarding Z's initial refusal to testify, the court's order for Z to testify and the resultant use immunity.

## B. Discussion

¶18 There is no Arizona authority directly on point. Arizona law recognizes agreements between the State and a witness can be relevant to impeach a witness's testimony. *See State v. Fisher*, 141 Ariz. 227, 245, 686 P.2d 750, 768 (1984). As explained above, however, there was no agreement between Z and the State. The Ninth Circuit has addressed use immunity in the context of impeachment, however, and those decisions are instructive.

¶19 In *United States v. Guthrie*, the Ninth Circuit held the trial court did not abuse its discretion when it limited the defendant's cross-examination of a witness who had use immunity, even though the witness obtained that immunity through a "deal" with prosecutors. 931 F.2d 564, 568 (9th Cir. 1991). The court noted the witness did not have immunity from prosecution and prosecutors could still investigate those crimes and prosecute the witness based on evidence not derived from the testimony. *Id.* Therefore, the "deal" with the witness "was not as 'sweet'" as the defendant claimed, any "incentive to lie" was not as great as the defendant alleged and, therefore, the trial court could properly limit cross-examination. *Id.*

¶20 In *Hein v. Sullivan*, the Ninth Circuit held that the failure to disclose a use immunity agreement with a witness did not deprive the defendant of a fair trial by preventing impeachment of the witness with the agreement because a use immunity agreement is "not the potent impeachment evidence petitioners make it out to be." 601 F.3d 897, 917 (9th Cir. 2010). The Ninth Circuit noted such agreements afford no benefits to the witness such as dismissed charges or immunity from prosecution, but only limit the use of the witness's testimony and, in fact, leave the witness in the same position the witness would be in if the witness did not testify. *Id.*

¶21 Here, the trial court ordered Z to testify pursuant to A.R.S. § 13-4064, which in turn required the court to give Z use immunity. There was no agreement of any sort between Z and the State. The State offered

nothing to obtain or otherwise induce Z's testimony, let alone testimony favorable to the State's case. The State did not agree to dismiss any charges or grant Z immunity from prosecution for any offense, nor did the State offer leniency for any pending or future charge. Z testified because the trial court ordered him to, not because he reached some sort of beneficial agreement with the State. Further, the penalties Z faced if he refused to testify or if he testified falsely were the same faced by any witness. Finally, just as with the witness in *Hein*, Z was in the same position with use immunity as he would have been if he did not testify at all. For these reasons, the trial court could reasonably determine Z's use immunity and the manner in which Z obtained that use immunity were not relevant to any issue before the jury.

¶22          Even assuming that exposing Z's use immunity at trial would have discredited him and that it was error to exclude such evidence, *see Merritt v. People*, 842 P.2d 162, 168 (Colo. 1992), the facts about which Z testified were merely cumulative to other evidence in the record and thus, not of great import to the prosecution's case. The only significant portion of Z's testimony—that there were calls between Z's phone and G's phone—were facts otherwise established. In light of these circumstances and the fact that discrediting Z would not have made a material difference in the evidence, there is no reversible error. *See Merritt*, 842 P.2d at 168 (determining confrontation error occurred because defendant not given opportunity to cross examine witnesses, and applying harmless error review to determine that error was not harmless

given the importance of the two witnesses' testimony to the prosecution's case).[1]

## III.    Admission of Evidence of Leyba's Gang Affiliation

**¶23**        Leyba contends the trial court erred when it admitted the evidence of his gang affiliation cited above.  Leyba argues the evidence was irrelevant and that any probative value was substantially outweighed by the danger of unfair prejudice.  Leyba further argues the trial court "refused" to conduct an analysis pursuant to Rule 403 of the Arizona Rules of Evidence to determine whether the danger of unfair prejudice substantially outweighed the probative value of the evidence.  "The trial court has considerable discretion in determining the relevance and admissibility of evidence, and we will not disturb its ruling absent a clear abuse of that discretion."  *State v. Amaya-Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990).

**¶24**        We find no abuse of discretion.  The trial court held the evidence was relevant to show the identity of the person who shot the victim.  "Evidence of gang affiliation is admissible when it is relevant to a material issue in the case" such as identity, bias, or motive.  *State v. Jackson*, 186 Ariz. 20, 26, 918 P.2d 1038, 1044 (1996).  Evidence of the tattoos indicative of Leyba's membership in the 18th Street gang and his statements that he was a "gangster" and a "hitman" were all relevant to determine the identity of the person who shot the victim moments after the person told the victim he was dealing with "18th Street."

---

[1] Leyba was not left without methods to impeach Z's credibility.  The jury heard evidence that Z was a convicted felon and that he had been convicted of forgery just months before his testimony.  The jury further heard evidence regarding how Z never mentioned the alleged phone incident in earlier interviews with law enforcement officers.  We also note Z testified only that the gun he saw in Leyba's possession at the time he obtained the phone was "similar" to the gun used to shoot the victim, whereas other witnesses testified the gun they saw in Leyba's possession was the same gun used to shoot the victim.  Therefore, Z's testimony regarding the gun was cumulative.  Finally, we note that Leyba explained to the jury that if they believed the testimony of various witnesses regarding the timing of events, then some of the calls between Z's phone and G's phone occurred while Leyba and G were in each other's immediate presence, something that would make no sense.

¶25      Regarding the failure to make express findings pursuant to Rule 403, there is nothing in the record to suggest the court "refused" to make express findings. Additionally, Leyba neither requested that the court make specific findings nor objected to the court's failure to do so. A defendant who fails to request express findings pursuant to Rule 403 waives that issue on appeal absent fundamental error. *See In re Commitment of Jaramillo*, 217 Ariz. 460, 465, ¶ 18, 176 P.3d 28, 33 (App. 2008). Further, we need not reverse a conviction when a trial court fails to make an express finding that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence so long as "the record sufficiently demonstrates that 'the necessary factors were argued, considered, and balanced by the trial court as part of its ruling.'" *Id.* (quoting *State v. Beasley*, 205 Ariz. 334, 337, ¶ 15, 70 P.3d 463, 466 (App. 2003)).

¶26      Here, although Leyba did argue the danger of unfair prejudice substantially outweighed the probative value of the evidence, the focus of his argument was that the evidence of his gang affiliation, aside from his tattoos, was not credible. Further, the record shows the court did evaluate the evidence in the context of Rule 403. As part of its ruling, the court excluded all evidence of Leyba's tattoos that did not indicate membership in the 18th Street gang as unfairly prejudicial. The trial court also gave an instruction limiting the jury's consideration of evidence that "may tend to suggest" Leyba was a member of a gang. The court instructed the jury the evidence was relevant only to the determination of the identity of the person who shot the victim and why some witnesses may have made inconsistent statements, and that the jury could not consider it as evidence Leyba had a disposition to engage in criminal conduct or that he was otherwise a bad person. The court further instructed that the jury could not find Leyba guilty simply because they believed he might be a member of a gang. "Juries are presumed to follow their instructions." *State v. Dunlap*, 187 Ariz. 441, 461, 930 P.2d 518, 538 (App. 1996). We also note the court addressed the possibility of the admission of gang related evidence during voir dire. The court dismissed each potential juror who expressed concerns that evidence of gang affiliation might affect his or her ability to be fair and impartial. All the remaining potential jurors indicated they did not believe a person was more likely to be guilty simply because he or she might be in a gang. Therefore, "the record sufficiently demonstrates that the necessary factors were argued, considered, and balanced by the trial court as part of its ruling," *id.*, even though the court did not provide a detailed analysis pursuant to Rule 403. For these reasons, we find no error, fundamental or

otherwise, in the failure to make more specific, express findings pursuant to Rule 403.

**¶27**            Finally, within his argument, Leyba asserts *State v. Baldenegro*, 188 Ariz. 10, 932 P.2d 275 (App. 1996), requires that at least two statutorily defined criteria for gang membership be present before evidence of gang affiliation may be admissible. *Baldenegro* contains no such holding and simply addressed statutory definitions in A.R.S. § 13-105 (Supp. 2013) of "criminal street gang" and "criminal street gang member," 188 Ariz. at 14, 932 P.2d at 279, for purposes of analyzing the crime of assisting a criminal street gang, *id.* at 15, 932 P.2d at 280. The State did not charge Leyba with assisting a criminal street gang and there is no authority to support Leyba's contention that two identifying factors must be present before a trial court may admit evidence of gang affiliation for purposes of identity. Section 13-105 does not govern the evidentiary issue here.

## IV.    Admission of Hearsay as a Present Sense Impression

**¶28**            As noted above, shortly before the murder, G entered the residence and told the owner, "don't freak out. Capone is here." Leyba argues the trial court erred when it admitted the hearsay statement "Capone is here" as a present sense impression pursuant to Arizona Rule of Evidence 803(1). Again, we review the trial court's ruling on the admissibility of evidence for abuse of discretion. *Amaya-Ruiz*, 166 Ariz. at 167, 800 P.2d at 1275.

**¶29**            "To qualify as a present sense impression under Rule 803(1), a statement must 'describ[e] or explain[] an event or condition' while the viewer is perceiving it or immediately thereafter." *State v. Payne*, 233 Ariz. 484, 503, ¶ 50, 314 P.3d 1239, 1258 (2013) (quoting Ariz. R. Evid. 803(1)). The trial court held the statement was a present sense impression, finding the statement "Capone is here" is in the present tense and described the speaker's observation at that time rather than something that occurred in the past.

**¶30**            We find no abuse of discretion. "Capone is here" is in the present tense and communicates the message that "Capone" is present at that location right now. It also communicates that the speaker is either observing Capone at that time or that the speaker observed Capone immediately before making the statement. Despite Leyba's arguments to the contrary, there is nothing about the statement "Capone is here" that suggests the speaker had just driven Capone "here" or that the speaker

was describing some other past event. Further, there is nothing about the statement "Capone is here" to suggest the speaker's knowledge was based on anything other than the speaker's own perception.

¶31 Leyba relies on *State v. Bass*, 198 Ariz. 571, 12 P.3d 796 (2000), for the proposition that the trial court should have excluded the statement. *Bass* has no application because in that case the supreme court found the hearsay statements at issue were not excited utterances pursuant to Arizona Rule of Evidence 803(2). 198 Ariz. at 577, ¶ 20, 12 P.3d at 802. The court did not address the present sense impression exception found in Rule 803(1). The court further found the statements lacked trustworthiness because the hearsay declarant was unidentified and the witness who claimed to have heard the statement was an interested party who may have been personally responsible for the accident at issue. *Id.* at 579-580, ¶¶ 32-33, 12 P.3d at 804-805. Here, the declarant was known and there is no evidence the person who heard the statement was an interested party or was otherwise responsible for the incident. In short, nothing in *Bass* required the trial court to preclude admission of the statement "Capone is here."

## V. Prosecutorial Misconduct

¶32 As the final issue on appeal, Leyba argues the prosecutor engaged in misconduct when he addressed testimony regarding DNA evidence during closing and rebuttal argument. The DNA evidence was on a plastic bag that allegedly contained clothing Leyba wore when he shot the victim. Law enforcement officers found the bag based on information obtained from G. Leyba asserts that the prosecutor argued matters not in evidence and/or intentionally misstated the evidence when he addressed the DNA evidence. Leyba, however, did not object to any of the alleged misconduct. A failure to object to alleged prosecutorial misconduct at the time of trial waives the issue absent fundamental error. *State v. Wood*, 180 Ariz. 53, 66, 881 P.2d 1158, 1171 (1994). "To establish fundamental error, [a defendant] must show that the error complained of goes to the foundation of [the] case, takes away a right that is essential to [the] defense, and is of such magnitude that [the defendant] could not have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 568, ¶ 24, 115 P.3d 601, 608 (2005). A defendant must also demonstrate that such error was prejudicial. *Id.* at ¶ 26. In our determination of whether a prosecutor's conduct amounts to fundamental error, we focus our inquiry "on the probability [the conduct] influenced the jury and whether the conduct denied the defendant a fair trial." *Wood*, 180 Ariz. at 66, 881 P.2d at 1171. "Reversal on the basis of prosecutorial misconduct requires that

the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998).

**¶33**       "[D]uring closing arguments, counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."  *State v. Bible*, 175 Ariz. 549, 602, 858 P.2d 1152, 1205 (1993).  Further, prosecutors have wide latitude in closing argument.  "[E]xcessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not previously been offered and placed before the jury."  *State v. Jones*, 197 Ariz. 290, 305, ¶ 37, 4 P.3d 345, 360 (2000) (quoting *State v. Gonzales*, 105 Ariz. 434, 437, 466 P.2d 388, 391 (1970)).

**¶34**       We find no fundamental error.  In the first argument Leyba identifies as improper, the prosecutor argued:

> The bag has DNA, and every DNA location, aside from two of the defendant's DNA at that location being exactly the same [sic].  There are a couple of [alleles] where there's not enough of the information to call.  For example, one where [the DNA expert] testified that the – [allele], that there was DNA there, and it's in the position where Leyba's DNA is, but there wasn't enough so she's not able to call it; and so for that reason, and because there's a lot of DNA there, she says that it's – she can't say that it's consistent, that it's inconclusive, but it's not a coincidence that at every location the defendant's DNA is found there.[2]

---

[2] The transcript consistently uses "leals" during the prosecutor's argument regarding the DNA evidence and "olios" during the DNA expert's testimony.  We are aware of no such terms in the context of the science of DNA.  "DNA is composed of several component parts, including four different base pairs.  The precise sequence of these base pairs in certain DNA segments determines genetic traits.  The segments of DNA that determine these genetic traits are called *alleles*."  *Bible*, 175 Ariz. at 576, 858 P.2d at 1179 (emphasis added).  Therefore, we correct the quotations to reflect the use of the words "allele" or "alleles" where appropriate.

The first statement is true. The bag at issue had DNA evidence on it. The second statement beginning with "and every DNA location" and ending with "exactly the same" although inaccurate and misleading, does not amount to misconduct that requires reversal. The expert testified that at twelve of the fourteen locations tested on the bag, ("every DNA location, aside from two" in the prosecutor's words), there were alleles present that were the same as alleles found in Leyba's DNA. The prosecutor clarified this statement to focus on alleles when he next said there were a "couple of [alleles]" for which there was not enough information to call one way or the other. Again, the expert testified twelve of fourteen locations tested had some of the same alleles as Leyba's DNA. The next series of statements regarding how and why the expert testified the DNA evidence was inconclusive were also true. The expert testified the DNA evidence was inconclusive and she could not exclude Leyba as a contributor. Finally, the statement that it is not a coincidence that Leyba's "DNA" is at every location, although an overstatement, did not constitute fundamental error given the context of the immediately preceding statements that referenced the presence of alleles at twelve of fourteen locations on the bag that were the same as alleles found in Leyba's DNA.

¶35 In the second argument Leyba identifies as improper, the prosecutor argued:

> Let's talk about that DNA. You go through this DNA, comparing the plastic bag with Arthur Leyba, like we did in court, you will see that on all but a couple of these things, every single location is the same as the defendant's. And while [the DNA expert], because of scientific things, isn't able to say consistent with, which is, I guess, a scientific way of saying hundred percent positive, but because she's not willing to say that that doesn't mean that it's not his DNA and boy, just happens to have almost everything be the same DNA as the defendant's on this bag [sic], that's supposedly a setup job?

In particular, the statement that "on all but a couple of these things, every single location is the same as the defendant's" is an inaccurate summary of the evidence. The expert testified that in twelve of the fourteen locations tested on the bag, the expert found alleles that were the same as alleles found in Leyba's DNA, but such evidence was not significant. The expert also explained several times that the test results were inconclusive. Although counsel's argument was inaccurate at least as to this point, the jury was instructed that closing arguments are not evidence, and counsel's

argument was so clearly belied by the scientific evidence presented to the jury that it did not constitute fundamental error. The next statements regarding how and why the expert testified she could not say the evidence was "consistent" with Leyba's DNA and how that did not necessarily mean it was not Leyba's DNA are correct. The expert explained why she could not say it was "consistent" and also explained she could not eliminate Leyba as the source of the DNA. Finally, the argument that the evidence shows Leyba was not "set up" because there "just happens to have almost everything be the same DNA as [Leyba's]," when viewed in the context of the evidence explained above and the entirety of the prosecutor's argument, did not constitute fundamental error.

¶36　　　It is important to note that the DNA expert made it abundantly clear to the jury that the DNA evidence was inconclusive. She could not exclude Leyba as a source of DNA on the bag, nor could she conclude he was a source of DNA on the bag. She further made it clear that on twelve of the fourteen locations on the bag she tested, she found alleles that were the same as alleles found in Leyba's DNA. Given this evidence, and viewing the prosecutor's poorly-worded arguments in the context of this evidence, we cannot say such argument prejudiced Leyba or constituted fundamental error.

## CONCLUSION

¶37　　　Because we find no reversible error, we affirm Leyba's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
F I L E D : MJT